**FIRST NATIONWIDE BANK, A Federal Savings Bank, A Federal Stock Association, Plaintiff–Appellant,**

v.

**GELT FUNDING CORP., Allen I. Gross, Ralph Herzka, Shimon Eckstein, 505 Realty Associates, Prospect Realty Associates, Judah Wolf, Meir Unsdorfer, New Heights 765 Riverside Limited Partnership, New Heights (765 Riverside) Management Corp., 1691 Eastburn Realty Co., Sol Gross (a/k/a Eugene Gross), Joseph Friedman, 1261 Central Avenue Owners Corp., 65–11 Realty Co., Aviezier Cohen, Elaine Cohen, 730 Realty Associates, David Malek, Peter Rebenwurzel,**

**36 Plaza Street Owners Corp., Robert Wolf, 350 Sterling Associates, Edith Gross, Brookhaven Realty Associates, Crown Equities Limited Partnership, Adar Two Realty Co., 100 Realty Company, Esther Shur, E. Phillip Weingarten, New Heights (173–174) Limited Partnership, Temple Apartments Management Corporation, 740 Realty Associates, 2344 Davidson Associates, Jacob Rabinowitz, 1958 Realty Associates, Menachem Halberstam, Mordechai Halberstam, 273 Realty Associates, 2608 Realty Associates, Solomon Werdiger, Esther Werdiger, Defendants–Appellees.**

**No. 457, Docket 93–7422.**

United States Court of Appeals, Second Circuit.

Argued Oct. 18, 1993.

Decided June 9, 1994.

---

James L. Stengel, New York City (Andrew M. Calamari, Jodi E. Freid, Deanna R. Waldron, Donovan, Leisure, Newton & Irvine, New York City, Roger B. Mead, Folger & Levin, San Francisco, CA, of counsel), for plaintiff-appellant.

Lewis R. Clayton, New York City (Mark A. Silberman, Paul, Weiss, Rifkind, Wharton & Garrison, of counsel), for defendants-appellees Gelt Funding Corp., Allen I. Gross, Sol Gross a/k/a Eugene Gross, 350 Sterling Associates, Edith Gross, Brookhaven Realty Associates, 2608 Realty Associates, Solomon Werdiger, and Esther Werdiger.

Nathan Lewin, New York City (Miller, Cassidy, Larroca & Lewin, Washington, D.C., Sara Moss, Howard, Darby & Levin, New York City, of counsel), for defendant-appellee Ralph Herzka.

Edward D. Fagan, New York City (Fagan & Associates, New York City, of counsel), for defendants-appellees Shimon Eckstein and 505 Realty Associates.

Rosenfeld & Maidenbaum, Cedarhurst, NY (Meir Rosenfeld, New York City, of counsel), for defendant-appellee Judah Wolf.

Robin Feingold Singer, New York City (Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, of counsel), for defendants-appellees New Heights 765 Riverside Ltd. Partnership, New Heights 765 Riverside Management Corp., New Heights (173–174) Ltd. Partnership, Temple Apartments Management Corp. and Crown Equities Ltd. Partnership.

Irving P. Seidman, P.C., New York City (Irving P. Seidman, of counsel), for defendants-appellees 1261 Central Avenue Owners Corp., 36 Plaza Street Owners Corp., and Robert Wolf.

Sheldon Rudoff, New York City (Goodkind, Labaton Rudoff & Sucharow, Mark S. Arisohn, James W. Johnson, of counsel), for defendants-appellees 730 Realty Associates, David Malek, Peter Rebenwurzel, Adar Two Realty Co., 740 Realty Associates, and 2344 Davidson Associates.

Before: MAHONEY and WALKER, Circuit Judges, and METZNER, District Judge.*

WALKER, Circuit Judge:

This appeal raises issues surrounding the requirements for pleading a private civil cause of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d). Principal among these is whether, where the predicate to the RICO claim is fraud by a borrower in misrepresenting the value of collateral, the fraud is complete before any actual loss is realized because the lender incurs additional concealed risk. Plaintiff-appellant First Nationwide Bank ("FNB" or the "Bank") appeals from a judgment of the United States District Court for the Southern District of New York (Michael B. Mukasey, *Judge* ), dismissing its complaint for failure to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(6). In its amended complaint, FNB alleges that the defendants misrepresented the value of properties pledged as collateral to secure nonrecourse loans, and thereby fraudulently induced FNB to make loans it otherwise would not have made. FNB claims that it was damaged in an amount equal to the fraudulently induced portion of the loans. The amended complaint contains two counts under RICO, 18 U.S.C. § 1962(c) and (d), and seven pendent state law claims.

The district court concluded that FNB had not sufficiently alleged: (1) that it suffered

an injury cognizable under RICO; (2) that the alleged fraud proximately caused FNB's loss; or (3) that the eighteen borrowers named as defendants were part of a RICO enterprise. The court thus dismissed the RICO counts of the amended complaint, and absent a substantial federal question, the pendent state law claims as well. Because we agree that FNB has not adequately plead injury and proximate cause, we affirm.

## BACKGROUND

We review *de novo* the district court's dismissal under Rule 12(b)(6), taking as true the factual allegations in the complaint, and drawing all reasonable inferences therefrom in FNB's favor. *Ferran v. Town of Nassau,* 11 F.3d 21, 22 (2d Cir.1993).

FNB is a federal stock association based in San Francisco, California with offices in New York City. Prior to 1985, FNB's business consisted primarily of making purchase money mortgage loans to individuals. In 1985, FNB's parent corporation, First Nationwide Financial Corp., was purchased by Ford Motor Company. In May of that year, FNB began a significant expansion of its lending activities in New York by offering nonrecourse mortgage loans to owners and purchasers of commercial properties, principally multi-unit apartment buildings. Over the next five years FNB made over 1,000 nonrecourse loans to commercial property investors in the New York Metropolitan area in an aggregate amount of approximately $1.3 billion. In November 1990, in the midst of a severe downturn in the New York real estate market, FNB phased out its commercial lending business and stopped making commercial loans through its New York office.

Defendant Gelt Funding Corp. ("Gelt Funding") is a commercial mortgage broker that represents owners and potential buyers of commercial property, and helps them obtain financing for their transactions. Defendants Allen I. Gross and Ralph Herzka are Gelt Funding's principals: Gross its president and principal or sole shareholder, Herz-

---

* Hon. Charles M. Metzner, United States District Judge for the Southern District of New York, sitting by designation.

ka an officer and employee. Between 1985 and 1990, Gross and Herzka cultivated a lucrative relationship with FNB on Gelt Funding's behalf in which Gelt Funding served as mortgage broker for borrowers of about $900 million in loans comprising roughly seventy percent of FNB's commercial mortgage portfolio. Eighteen of those borrowers are alleged to have supplied fraudulent information in their loan applications and are named as defendants in this action. The remaining individual defendants are alleged to be partners in, or otherwise affiliated with, one or more of the defendant borrowers.

FNB made all the loans in question on a nonrecourse basis. In a nonrecourse loan transaction, the lender gives up its right to sue the borrower personally upon default, and is confined to recourse against the collateral property. Because the lender's remedy upon default is limited to the value of the property, that value is critical to the lender's decision whether to make the loan. Accordingly, before making a loan, FNB required borrowers to supply information about the property's operating income; the price for which the property was to be purchased; sale prices for the property in the previous three years; and whether the borrower intended to encumber the property with additional debt. FNB ordinarily would not make a nonrecourse loan unless the collateral property's net operating income was at least 1.05 times greater than the combination of principal and interest due on the loan, and the property value exceeded the loan amount by at least twenty-five percent.

During an audit of its commercial loan portfolio in 1991, FNB determined that a higher proportion of loans brokered by Gelt Funding had defaulted compared to other loans. In January 1992, FNB filed its original complaint in nine counts consisting of two RICO counts and seven state common-law claims. The first RICO count was brought against Gross, Herzka, and Gelt Funding (collectively, the "Gelt Defendants"). The second RICO count named, in addition to the Gelt Defendants, all the borrower entities and affiliated individuals (the "Borrower Defendants") who allegedly operated as a single organization, the so-called "Borrower Enter-

prise." The remaining seven state law counts alleged fraud, conspiracy to defraud, negligent misrepresentation, conversion, conspiracy to convert, unjust enrichment, and breach of fiduciary duty.

In its complaint, FNB alleged that Gross and Herzka used Gelt Funding to obtain nonrecourse loans by misrepresenting information pertinent to FNB's lending decision. Specifically, FNB claimed that Gross and Herzka intentionally misstated the operating income of the properties and concealed both the borrowers' intention to use the property to secure additional debt and the fact that artificial sales transactions were used to overstate property values. The complaint also alleged that FNB was led to believe that the borrowers and Gelt Funding were independent entities, when in fact Gross, Herzka, and a small group of undisclosed principals controlled most of the borrower entities.

Judge Mukasey dismissed FNB's original complaint without prejudice primarily on the ground that FNB had not adequately alleged two essential elements of a RICO claim—injury and proximate causation—because there were no specific allegations concerning the magnitude of the alleged misrepresentations or whether there was a causal connection between those misrepresentations and FNB's loss. *First Nationwide Bank v. Gelt Funding, Inc.*, No. 92 Civ. 0790 (MBM), 1992 WL 358759 (S.D.N.Y. Nov. 30, 1992). FNB then filed an amended complaint which set out in detail the current status of thirty allegedly fraud-tainted loans. FNB claimed that the thirty loans were representative of other fraudulent loans that FNB eventually would aver and prove at trial. For each of the thirty loans, FNB stated the original loan amount, the outstanding balance, the current market value of the property, and the amount of loss FNB attributed to the defendants' alleged fraud as opposed to declines in the real estate market.

The amended complaint relied on two injury theories to support the damages element of FNB's claims. First, FNB claimed that because the value of the collateral properties was overstated, FNB loaned more than it would have if it had known the true value, and was therefore undersecured for the addi-

tional amounts (the "Excess Loan Loss"). In calculating the Excess Loan Loss, FNB estimated the true value of the collateral properties at the time the loans were made, the amount FNB would have loaned if it had known the true value, and the loss it claims it would have sustained if it had not loaned the greater amount in reliance on the defendants' representations. By subtracting this estimated loss from the actual loss FNB claims it sustained on the loans, FNB arrived at its Excess Loan Loss. Second, FNB asserted that upon discovering the alleged fraud in 1991 it was required to restrict its use of additional assets to adhere to the federally mandated level of capital reserves. This, FNB claims, necessarily reduced the income it otherwise would have earned if it had loaned out the restricted funds (the "Excess Reserve Loss"). FNB includes this lost income as a consequential damage from the alleged fraud.

The district court again dismissed FNB's complaint. *First Nationwide Bank v. Gelt Funding, Corp.,* 820 F.Supp. 89 (S.D.N.Y. 1993). Upon careful review, Judge Mukasey found FNB's additional fact allegations and injury theories still insufficient to overcome the deficiencies found in the first complaint; namely, the failure to allege RICO injury and proximate cause. Moreover, the district court held that FNB's second RICO count was incomplete because FNB did not sufficiently allege that all the named defendants constituted a RICO "enterprise." This appeal followed.

## DISCUSSION

On appeal, FNB continues to press the injury and proximate cause issues raised in the district court. We hold that to the extent FNB's complaint is predicated on loans that have not been foreclosed, its claims are not ripe for adjudication because it is uncertain whether FNB will sustain any injury cognizable under RICO. Furthermore, even where FNB relies on loans that have been foreclosed, its complaint still must be dismissed because, as Judge Mukasey correctly concluded, the complaint does not adequately allege proximate cause.

### RICO Standing

In examining FNB's standing to assert its RICO claims, we begin, as we must, with the language of the statute. The private civil cause of action under RICO provides that:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c). From this language, courts have extracted the conditions a plaintiff must meet to satisfy RICO's standing requirements: "(1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23 (2d Cir.1990). Most important for purposes of this appeal are the two elements relied on by the district court in dismissing FNB's complaint, injury and causation.

### I.  *Injury*

FNB contends that its claims with respect to all fraudulent loans were "ripe" for suit the moment the loans were made, regardless of whether the borrowers presently were in default or whether FNB completed efforts to foreclose on the collateral properties. FNB asserts that although several of the loans in the amended complaint have not been sold, foreclosed, or restructured, FNB has standing to assert a RICO claim with respect to those loans, as well as other similar loans FNB might discover in the future. We find FNB's hypothesis that it may assert a RICO claim based on unforeclosed loans to be inconsistent with this circuit's precedent governing RICO standing and insufficient to support an allegation of injury under RICO.

### A.  *The Measure of Fraud Damages*

Under its Excess Loan Loss theory, FNB would classify all excess amounts loaned as fraud damages, recoverable even if the borrower repaid the loan in full with interest. FNB argues that any amounts recovered through foreclosure on the collateral properties would be applied in mitigation of dam-

ages, and are irrelevant to the determination of whether FNB has been or will be injured. According to FNB, it suffered immediate quantifiable injury when the loans were made because the loans were undersecured, FNB assumed additional risk of loss, and "[f]or all practical purposes, the[ ] additional funds were lost the moment the loans were made." We find this argument unpersuasive.

■ The general rule of fraud damages is that the defrauded plaintiff may recover out-of-pocket losses caused by the fraud. *See Disher v. Information Resources, Inc.,* 691 F.Supp. 75, 79 (N.D.Ill.1988), *aff'd,* 873 F.2d 136 (7th Cir.1989). In this case, the damages issue arises in the specific context of a fraudulently induced loan. In such cases, although the loan is procured through fraud, any amounts paid on the debt reduce the amount the plaintiff can claim as damages resulting from the fraud. *See Hermes v. Title Guarantee & Trust Co.,* 282 N.Y. 88, 93, 24 N.E.2d 859, 861 (1939); *Sager v. Friedman,* 270 N.Y. 472, 480–81, 1 N.E.2d 971, 973–74 (1936). Thus, the amount of loss cannot be established until it is finally determined whether the collateral is insufficient to make the plaintiff whole, and if so, by how much. *Sager,* 270 N.Y. at 482, 1 N.E.2d at 974 ("[T]he value of the stock … deposited as collateral for the loan, and the value it would have had if the defendants' representations as to the financial condition of that company had been true, furnishes no measure of any loss suffered by the plaintiff through wrongful inducement to make the loan.").

■ In determining fraud damages, any amount recovered by the fraudulently induced lender necessarily reduces the damages that can be claimed as a result of the fraud. Because the fraud defendant is not liable for all losses that may occur, but only for those actually suffered, only after the lender has exhausted the bargained-for remedies available to it can the lender assert that it was damaged by the fraud, and then only to the extent of the deficiency. FNB does not allege actual injury by simply claiming that it incurred additional risk of loss as a consequence of the fraud. *See Berg v. First State Ins. Co.,* 915 F.2d 460, 464–65 (9th Cir.1990) (rejecting corporate directors' claim that they suffered injury when insurance policies protecting them against risk of loss from shareholder derivative suit were cancelled, even though suit resulted in no award against them). Thus, we reject FNB's novel theory that it was damaged simply by being undersecured when, with respect to those loans not yet foreclosed, the actual damages it will suffer, if any, are yet to be determined.

### B. The Ripeness of FNB's RICO Injury

■ The rule of fraud damages described above has been adopted by this court in the context of deciding whether a defrauded plaintiff has standing under RICO. A RICO plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); *see Hecht,* 897 F.2d at 23. Furthermore, as a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite. *See Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1106 (2d Cir.1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989). Thus, a plaintiff who claims that a debt is uncollectible because of the defendant's conduct can only pursue the RICO treble damages remedy after his contractual rights to payment have been frustrated. *See Stochastic Decisions, Inc. v. DiDomenico,* 995 F.2d 1158, 1166 (2d Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 385, 126 L.Ed.2d 334 (1993).

■ For example, in *Stochastic Decisions* the plaintiff, a judgment creditor of a bankrupt company, brought a RICO action claiming that the company fraudulently conveyed assets to prevent the plaintiff from collecting on several judgments. We held that to the extent plaintiff successfully collected on the judgments, those amounts would reduce the RICO injury *pro tanto,* before any trebling occurred. *Id.* at 1165–66. Because plaintiff's collection efforts were ongoing and the actual amount of its injury was indefinite and unprovable, plaintiff did not yet have standing under RICO.

Similarly, in *Commercial Union Assurance Co. plc v. Milken,* 17 F.3d 608 (2d Cir.1994), RICO plaintiffs argued that they were "entitled to a trebling of their damage award *before* any offset through settlements, restitution, recoupment or otherwise." *Id.* at 612. The plaintiffs maintained that they were fraudulently induced into investing approximately $10.5 million, none of which had been recouped when they initiated suit, and that they were entitled to trebling of this sum even though the entire amount subsequently was repaid with interest. Citing *Stochastic Decisions,* we rejected this claim and held that to the extent the plaintiffs received the return actually bargained for, they had suffered no compensable RICO injury. *Id.*

In this case, the loss FNB would suffer as to those loans FNB has not finally foreclosed cannot yet be determined. Only when FNB's actual loss becomes clear and definite will the claims be ripe for suit. Until that time, FNB lacks standing under RICO to assert claims as to those loans.

## II. Proximate Cause

Even with respect to those loans that have been finally foreclosed, FNB's complaint suffers from the equally fundamental defect of not adequately alleging proximate cause. RICO provides a civil remedy only to those persons injured "by reason of" the defendant's predicate acts. To show that an injury resulted "by reason of" the defendant's action, and therefore to have standing under RICO, the plaintiff must allege "that the defendant's violations were a proximate cause of the plaintiff's injury, i.e., that there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct." *Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.,* 985 F.2d 102, 104 (2d Cir.1993). This requires a showing not only that the defendant's alleged RICO violation was the "but-for" or cause-in-fact of his injury, but also that the violation was the legal or proximate cause. *Holmes v. Securities Investor Protection Corp.,* — U.S. —, — – —, 112 S.Ct. 1311, 1316–18, 117 L.Ed.2d 532 (1992); *Standardbred Owners,* 985 F.2d at 104; *Hecht,* 897 F.2d at 23.

■ In the context of predicate acts grounded in fraud, the proximate cause requirement means that the plaintiff must prove both transaction and loss causation. *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1495 (2d Cir.1992); *Bastian v. Petren Resources Corp.,* 892 F.2d 680, 684 (7th Cir.), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990). Thus, in addition to showing that but for the defendant's misrepresentations the transaction would not have come about, the defendant must also show that the misstatements were the reason the transaction turned out to be a losing one. *K–H Corp.,* 968 F.2d at 1495; *Bastian,* 892 F.2d at 684. Furthermore, when factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions. *See Brandenburg v. Seidel,* 859 F.2d 1179, 1190 (4th Cir.1988).

The purpose of the proximate cause requirement is to fix a legal limit on a person's responsibility, even for wrongful acts. *See Holmes,* — U.S. at —, 112 S.Ct. at 1318; *Sperber v. Boesky,* 849 F.2d 60, 63 (2d Cir. 1988). Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were "a substantial factor in the sequence of responsible causation," and whose injury was "reasonably foreseeable or anticipated as a natural consequence." *Hecht,* 897 F.2d at 23–24. Although we are mindful of the admonition that RICO is to be liberally construed, the foregoing holds true in a RICO setting because proximate cause, a common law concept, exists independently of the statute. *See Sperber,* 849 F.2d at 60; *Brandenburg,* 859 F.2d at 1189 n. 11.

Many considerations enter into the proximate cause inquiry including "the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection." *Brandenburg,* 859 F.2d at 1189. We have recognized that the proximate cause determination "is not free from normative legal policy considerations," *Hecht,* 897 F.2d at 23, and indeed involves a judgment based upon

" 'some social idea of justice or policy.' " *Sperber,* 849 F.2d at 63 (quoting W.P. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser and Keeton on the Law of Torts* 264 (5th ed. 1984)). The key reasons for requiring direct causation include avoiding unworkable difficulties in ascertaining what amount of the plaintiff's injury was caused by the defendant's wrongful action as opposed to other external factors, and in apportioning damages between causes. *See Holmes,* —— U.S. at ——, 112 S.Ct. at 1320. Although the likelihood that the injury would result from the wrongful conduct is a consideration, the rule often has as much to do with problems of proof as with foreseeability. *See Imagineering, Inc. v. Kiewit Pac. Co.,* 976 F.2d 1303, 1312 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993); *Sperber,* 849 F.2d at 65–66.

■ In examining the issue of whether the defendants' alleged fraud was the proximate cause of FNB's injuries, Judge Mukasey articulated a three-part test:

[A] borrower who misstates the value of loan property or its rental income proximately causes injury to a bank when (1) the misrepresented value of the property was substantially above its actual value at the time of the misrepresentation, (2) the injury was sustained soon after the misrepresentation, and (3) external factors did not contribute to the injury.

1992 WL 358759, at *5. While these factors do not constitute an exhaustive list of the considerations that go into the proximate cause calculus, they do provide a useful guide for evaluating the sufficiency of FNB's proximate cause allegations. In determining whether the required directness is present in the context of a fraudulently induced loan, important considerations are the magnitude of the misrepresentations, the amount of time between the loan transaction and the loss, and the certainty with which the loss can be attributed to the defendant's conduct. With these precepts in mind, we turn to the question of whether FNB adequately pleaded proximate cause.

*A. Magnitude of the Overstatements*

At the outset, we are unable to tell accurately whether the alleged misrepresentations "substantially" overstated the value of the collateral properties because FNB's complaint provides no reliable measure of the alleged misrepresentations. The district court dismissed FNB's original complaint because in pleading causation it failed to provide any "order of magnitude" for the misrepresentations to support FNB's assertion that they were material. The court concluded that "[t]he bald assertion that misrepresentations were material is not a fact."

In response, FNB's amended complaint provides, for each of the thirty representative loans, a schedule purporting to set out the approximate amount by which the defendants overstated the property values. The value and profitability of multi-unit apartment complexes in New York, however, depend upon many factors that influence the general real estate market including changes in rent control laws, property taxes, vacancy rates, the level of city services provided, and increased operating expenses including electric and heating oil prices. Given the complexity of the New York real estate market, and the fact that FNB's losses came in the wake of a downturn in the real estate market, FNB must allege loss causation with sufficient particularity such that we can determine whether the factual basis for its claim, if proven, could support an inference of proximate cause. *See Finkel v. Stratton Corp.,* 754 F.Supp. 318, 330 (S.D.N.Y.1990). FNB's attempt to meet this burden suffers from several defects.

First, as with any estimate, the result of a property appraisal is only as reliable as the information used and the manner in which it is employed to approximate the factors that influence property values in the real world. Given the number of variables that can influence real estate values, an estimate necessarily involves a substantial amount of guesswork about how both present and future conditions will impact on the market, making it difficult to construct a reliable model. *Cf.* Collins, *A Question of Value,* 51 Mortgage Banking 33 (July 1991).

Second, FNB's task is made more difficult since it is attempting to reconstruct the value of the collateral properties at the time the loans were made, without accurate information regarding many of the variables that would go into that calculation. For instance, FNB's calculation of the "actual," as opposed to represented, property values when the loans were made, relies in turn on another estimate of the property's "true" net operating income ("NOI") at that time. *See* Amended Complaint ¶ 70. The Bank's NOI estimate was based on rent roll figures compiled by the New York Department of Housing and Community Renewal ("DHCR"), which often understate rental incomes and thus would understate property values, in some cases by a significant amount. Since the Bank's NOI figures were lower than the actual NOI, its estimate of the amount of fraud damages must to some extent be artificially high. Unfortunately, the same problems that hinder FNB in trying to estimate these figures also prevent us from determining the actual degree of discrepancy.

In addition, the amount of damages FNB claims to have suffered from the defaults is distorted because it includes contractual charges and penalties that are not generally recoverable under RICO as damages caused by the fraud. *See Sager*, 270 N.Y. at 481, 1 N.E.2d at 974 (damages for fraud do not include benefit of contractual bargain). For example, with respect to one loan made in December 1985, FNB claims that it loaned $485,000 based on a represented property value of $850,000, whereas if it knew the property was worth only $260,000 (according to FNB's *post hoc* estimate), it would have loaned only $170,000. Despite the fact that the loan was paid for six years without default, FNB alleges that the amount due on the $485,000 loan in December 1991 was approximately $551,000 including penalties and charges.

It is also apparent that FNB's methodology does not adequately account for the contribution of external market factors to the loss. For instance, with respect to the loan previously mentioned, FNB claims that the property value according to its latest appraisal is $400,000, fifty-three percent higher than its purported value of $260,000 in 1985. FNB advances this position despite the fact of a general decline in the real estate market during which other collateral properties, by FNB's own account, lost fifty percent of their value or more. It is also noteworthy that despite the fact that most of the properties listed in the complaint are alleged to have suffered a significant decline in market value since the loans were made, with respect to only three loans does FNB attribute any of its own loss to market decline.

The guesswork and inconsistencies in determining the magnitude of the alleged misrepresentations highlights the difficulty of proving damages in this case with a reasonable degree of certainty. Nor is FNB's complaint rescued by the principle that in deciding a Rule 12(b)(6) motion all reasonable inferences must be drawn in FNB's favor. Under Rule 12(b)(6), "the well-pleaded material allegations of the complaint are taken as admitted; but conclusions of law or unwarranted deductions of fact are not admitted." 2A Moore & Lucas, *Moore's Federal Practice* ¶ 12.08, at 2266–69 (2d ed. 1984); *see Fleming v. Lind–Waldock & Co.*, 922 F.2d 20, 23–24 (1st Cir.1990). This principle applies with even greater force in a fraud case governed by the more stringent pleading requirements of Fed.R.Civ.P. 9(b). *See O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676–77 (2d Cir.1991); *McCoy v. Goldberg*, 748 F.Supp. 146, 155 (S.D.N.Y.1990). The amended complaint does allege that FNB's "losses are not the result of any general decline in the real estate market." Amended Complaint ¶ 67. However, this conclusory statement is based on FNB's faulty damages theories and its unsupported claims regarding the "actual" value of the collateral properties when the loans were made. *See id.* In the absence of a factual basis underlying FNB's causation claim, we cannot accept its allegation as fact. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (dismissing fraud complaint where facts alleged did not support inference that defendants knew "continuing erosion of the real estate market would render the loan portfolio precarious"); *Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442, 445 (2d Cir. 1971) (conclusory allegation of fraud insuffi-

cient where facts alleged did not support inference thereof); *see also Kadar Corp. v. Milbury,* 549 F.2d 230, 233 (1st Cir.1977) ("[C]ourts do 'not accept conclusory allegations on the legal effect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened....' ") (quoting Wright & Miller, *Federal Practice and Procedure: Civil* § 1357).

The methodology employed by FNB in determining the magnitude of the defendants' alleged overstatements of income is so defective, and the conclusions reached so defy logic, that no "reasonable inferences" can be drawn therefrom. No amount of detail can save FNB's complaint when the detail is based on flawed and unreasonable methodologies that lead to unsupported conclusions.

### B. Temporal Connection and Intervening Factors

Even if we were to accept FNB's questionable methodology for alleging the magnitude of the defendants' alleged fraud, the complaint still falls short of pleading proximate cause because FNB's alleged injury was insufficiently close in time to the alleged misrepresentations to warrant the inference of a nexus between the two. The second and third factors relied on by Judge Mukasey, dealing with the time lapse between the alleged fraud and the plaintiff's injury and the presence of external factors, are related. When a significant period of time has elapsed between the defendant's actions and the plaintiff's injury, there is a greater likelihood that the loss is attributable to events occurring in the interim. Similarly, when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases. *Bastian,* 892 F.2d at 684.

In this case, the substantial period between the alleged fraud and FNB's loss, coupled with the concurrence of that loss with the real estate market crash, is additional support for the conclusion that the fraud was not a substantial cause of FNB's injury. Despite FNB's allegation that the net operating income for most of the collateral proper-

ties was insufficient to service the principal and interest payments due on the loans, few of the properties went into default until mid–1990, when the real estate market collapsed. We agree with the district court that the five year interval between the bank's losses and the defendants' alleged misrepresentations strongly suggests that external factors were a substantial cause of those losses.

As noted above, the proximate cause determination necessarily involves a component of policy. *See Hecht,* 897 F.2d at 23. Here, "[n]o social purpose would be served by encouraging everyone who suffers an investment loss because of an unanticipated change in market conditions to pick through [loan applications] with a fine-tooth comb in the hope of uncovering a misrepresentation." *Bastian,* 892 F.2d at 685. As in *Bastian,* FNB may "have alleged the cause of [its] entering into the transaction in which [it] lost money" but it has not alleged "the cause of the transaction's turning out to be a losing one." *Id.* at 684. FNB's claims fail because it has not adequately plead facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.

We do not mean to suggest that in all cases a fraud plaintiff will be unable to plead proximate cause when the claim follows a market collapse. In this case, it is the cumulative effect of the considerations discussed above, rather than any single factor, that compels our decision.

### CONCLUSION

With respect to those loans not foreclosed, FNB has not alleged an injury ripe for suit under RICO. As to those and the other loans enumerated in the complaint, proximate cause has not been adequately alleged. Accordingly, the judgment of the district court is affirmed.