Joseph **DEFALCO**, Eleanor Defalco, Robert Brown, Janice Brown, Top of the World Estates, Inc. and JOBO Associated, Inc., Plaintiffs,

v.

William **DIRIE**, John Bernas, John Bernas, Inc., JML Quarries, Inc., V. Edward Curtis, Alfred Steppich, Richard Ferber, Donald Meckle, Paul Rouis, Harry Fisher, and Terry Kelly, Defendants.

No. 90 Civ. 5732(BDP).

United States District Court,
S.D. New York.

Sept. 21, 1997.

Michael L. Levine, Law Firm of Michael L. Levine, New York City, for Plaintiffs.

James J. Harrington, Harrington Haley, L.L.P., New York City, for Defendants Dirie and Curtis.

Jeffrey R. Mann, Martin J. Schwartz, Rubin Baum Levin Constant & Friedman, New Yotk City, Max Wild, Mt. Vernon, NY, for Defendant Rouis.

Scott G. Goldfinger, Law Office of Scott G. Goldfinger, New York City, for Defendants John Bernas, John Bernas, Inc., JML Quarries, Inc.

## MEMORANDUM DECISION AND ORDER

PARKER, District Judge.

Plaintiff Joseph DeFalco ("DeFalco") brought an action for violations of 18 U.S.C. § 1962(c), a provision of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1961–68 ("RICO") against various defendants claiming that his efforts to develop Top of the World Estates, Inc. ("the Project"), a real estate development in Sullivan County, New York, were illegally impeded as a result of the defendants' operation of the Town of Delaware, New York as a RICO enterprise. *See* 18 U.S.C. § 1962(c). After pretrial proceedings eliminated a number of defendants, DeFalco's claims against the eleven remaining defendants were tried to a jury between December 10 and December 20, 1996.

The jury found that the Town of Delaware (the "Town") had operated as a RICO enterprise and that six of the defendants had conducted or participated in the affairs of the Town through a pattern of racketeering activity.[1] The jury found that each of the six committed two or more predicate acts and assessed monetary damages (prior to trebling) as follows:

| | |
|---|---|
| William Dirie | $ 250,000 |
| John Bernas | $ 500,000 |
| JML Quarries, Inc. | $ 500,000 |
| V. Edward Curtis | $ 250,000 |
| Paul Rouis | $1,000,000 |
| John Bernas, Inc. | $ 0 |

Each of these defendants timely filed motions for judgment as a matter of law and for a new trial pursuant to Rules 50(b) and 59,

Fed.R.Civ.P. Because we conclude that there was insufficient evidence for the trier of fact to have concluded that the predicate ·acts found to have been committed by Rouis or Curtis were the proximate cause of harm to DeFalco's business or property, their motions for judgment as a matter of law pursuant to Rule 50(b) are granted. Because we also conclude that the proof of damages adduced at trial was too speculative and imprecise to support the damages awarded by the jury, and because, on the facts of this case, the issues of damages and liability are inextricably intertwined, the remaining four defendants—William Dine, John Bernas, JML Quarries, Inc., and John Bernas, Inc.—are entitled to a new trial on both liability and damages.

### Paul Rouis and V. Edward Curtis

The jury found that Rouis committed two predicate acts of extortion against DeFalco. The first was that he coerced DeFalco to retain him as the accountant for the Project and for JOBO Associates, Inc. ("JOBO"), an entity involved in developing the Project. The second was that he coerced DeFalco to transfer one-third of the shares of JOBO stock to John Bernas.[2]

The jury similarly found two predicate acts of extortion by Curtis. The first was that Curtis, by threatening to use his official position as Chairman of the Town Planning Board to adversely affect the Project, coerced DeFalco to purchase nursery stock from Ernest Matern, who operated a nursery in the area. The second was that Curtis employed similar threats to coerce DeFalco to retain a Mr. Glavin as landscape architect for a portion of the Project.

Rouis and Curtis offer a number of contentions in support of their motions pursuant to Rule 50(b). Two merit discussion. The first is that the proof at trial failed to establish that RICO damages were proximately caused by the predicate acts they were found to have committed. The second is that, assuming the evidence offered at trial satisfied the

---

1. The jury returned verdicts in favor of the other five defendants.

2. JOBO owned a lucrative gravel pit on DeFalco's land and the jury found that defendants

John Bernas, John Bernas, Inc. and JML Quarries, Inc. extorted gravel from DeFalco. John Bernas, Inc. and JML Quarries, Inc. were both owned and controlled by John Bernas.

proximate cause requirement, there was no competent proof of the amount of RICO damages suffered by DeFalco as a result of the predicate acts.

■ It is well settled in this Circuit that a litigant faces a heavy burden in attempting to establish that a jury's verdict must be set aside for insufficient evidence. *See Schlaifer Nance & Company v. Estate of Andy Warhol,* 119 F.3d 91 (2d Cir.1997). Mindful of the deference due the jury's work and its conclusions, the Court, having presided at trial and having reviewed the record, concludes that the evidence before the jury afforded no basis for a reasonable conclusion that DeFalco was injured by reason of the violations committed by Rouis and Curtis. *See First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763 (2d Cir.1994).

■ Judgment as a matter of law pursuant to Rule 50(b) is appropriate only when there is "either an utter lack of evidence supporting the verdict, so that the jury's findings could only have resulted from pure guess-work, or the evidence [is] so overwhelming that reasonable and fair-minded persons could only have reached the opposite result." *Doctor's Associates, Inc. v. Weible,* 92 F.3d 108, 112 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997) (citations omitted) *Weldy v. Piedmont Airlines, Inc.,* 985 F.2d 57 (2d Cir.1993); *U.S. v. One Parcel of Property Located at 121 Allen Place, Hartford, Conn.,* 75 F.3d 118 (2d Cir.1996); *Schlaifer Nance* 119 F.3d at 98. With these high standards in mind, we turn to the predicate acts found to have been committed by Rouis and Curtis and the damages awarded.

The theory DeFalco pursued was that the Town was operated as a RICO enterprise and that the defendants, who were influential local residents, exploited and ultimately injured him, an outside developer, by insinuating themselves into and exerting control over the Project.

Rouis was not an official of the Town but, for a time, he was the County Administrator of Sullivan County, where Delaware is located. Early in the development of the Project, DeFalco was introduced to Rouis by John Bernas, a local businessman. The three discussed the Project. Rouis, who was a certified public account, wished to become the accountant for the Project and told DeFalco that "nothing is going to happen" with respect to the Project without Rouis' assistance. [Tr.12/12, p. 530] Specifically, Rouis said, "you're going to have to do exactly like I tell you or you are out of here. I am the County' Administrator of Sullivan County. I want to be involved with the project 100%. I want to be the accountant for this project." *Id.* This conduct formed the basis for the first of the two predicate acts found to have been committed by Rouis. DeFalco's theory as to why this conduct-constituted extortion proceeds as follows:

> After DeFalco told Rouis that he was planning to use his son (who was working at Touche–Ross, a large New York City accounting firm) as his accountant, Rouis said "I have to be the accountant.... This is the way it is in Sullivan County. If you want this thing to go, listen to what I'm telling you ... Sullivan County has to approve this development and this ain't Long Island ... Do as I'm telling you. This is it ... you don't have a choice." [Tr.12/10, p. 209–211; Tr.12/12, p. 528, 530; Tr.12/16, p. 157.157]. (Plaintiffs' Brief in Opposition to Rouis' Post–Trial Motions, p. 15).

With respect to the JOBO stock, the proof relied on by DeFalco to support the jury's findings was that Rouis, as the Project's accountant, entered on the Project's financial statements a false $276,000 payable to Bernas. This entry fraudulently reflected monies owing to Bernas for services in connection with road work on an initial phase of the Project. Rouis then threatened to cause a tax audit of the Project unless DeFalco conveyed the JOBO shares to Bernas. More specifically:

> "Indeed, Rouis had engineered a situation whereby he would be able to accomplish that threat because he had created on [the Project's] books and records a phony indebtedness to Bernas that did not actually exist. In DeFalco's words: 'Mr. Rouis added on [to the books and records of the Top of the World development] a $276,000

payment that I owe John Bernas. I didn't owe John Bernas a dime. I can show you every bill. I paid Bernas immediately and it was marked paid in full. So this was a set up to have a rope around my neck, that in case I didn't give the stock, that Mr. Rouis would testify that I owed Bernas all this money.' [Tr.12/11, p. 337]. Rouis created this mythical 'indebtedness' on the balance sheet for Top of the World that he created [Ex.58; Tr.12/11, p. 338]. He also used that same information on Top of the World's tax returns, which were also prepared by Rouis' office [Tr.12/18, p. 359–360]." (Plaintiffs' Brief in Opposition to Rouis' Post–Trial Motion, pp. 12–13).

In finding that Rouis had committed two predicate acts and that those acts had caused DeFalco $1,000,000 in damages, the jury apparently accepted DeFalco's theories with respect to both the selection of Rouis as the Project's accountant and the transfer of the JOBO stock.

Rouis disputes that his conduct constituted extortion. He contends that his retention as DeFalco's accountant was not the result of extortion because the proof at trial contained no evidence that DeFalco acted out of fear of Rouis (or of any other defendant) but rather indicated that DeFalco willingly hired Rouis to secure a competitive advantage for the Project. DeFalco believed, according to Rouis, that he was an influential official in Sullivan County, who could facilitate the Project by guiding DeFalco through the somewhat muddy waters of local development.

As to the stock transfer, Rouis contends that the threat of an IRS audit could not have constituted extortion because DeFalco could have had no legitimate fear of the IRS audit allegedly threatened by Rouis. Rouis was an official of Sullivan County, not the IRS and he had no control over the IRS (or any other taxing authority). DeFalco offered no evidence to suggest that Rouis' threat of an IRS audit had reasonably appeared credible to DeFalco.

According to Rouis, the financial statement that reflected the $276,000 payable was not an audited statement but simply a compilation that reflected the agreement between DeFalco and Bernas, as Rouis understood it,

Thus, DeFalco was free either to correct the financial statement himself or to direct Rouis, or any other accountant, to correct it to reflect only those items the Project's management believed to be legitimate. Consequently, the erroneous financial statement did not compel DeFalco to transfer JOBO stock to Bernas—or to do anything else.

DeFalco's theory as to how Curtis caused a RICO injury is somewhat more attenuated:

One need only to go to the testimony of Joseph DeFalco to establish that the jury's determination of this issue had evidentiary support. In describing one of his first meetings with Curtis, DeFalco testified that Curtis specifically directed him to purchase nursery goods from Curtis (through Matern, as landscaper) and to use Glavin as the landscape architect (so that Glavin could dictate what shrubs to purchase). In directing DeFalco to do that, Curtis made it clear that, as Chairman of the Planning Board, Curtis would "make things go easier" with obtaining Planning Board approval for the plaintiffs' development, "help [DeFalco] get through the Planing Board," and "guide [DeFalco] through the muddy waters." The obvious implication of Curtis' statements in this regard was that, if DeFalco failed to adhere to Curtis' demands, Curtis would make it "hard" to obtain the necessary approvals from the Panning (sic) Board. Indeed, DeFalco specifically testified that he did what Curtis instructed because he was "following what Mr. Curtis told me to do" and "I simply had not choice in the matter; I was told to buy through Curtis, and I was told to use Glavin … Mr. Curtis told me to use these people." DeFalco also testified that Curtis dictated the exact clandestine manner in which he wanted DeFalco to structure the purchases (through Matern) so that there would be no directly traceable connection between Curtis and plaintiffs. [Tr.12/10, p. 142–148; Tr.12/11, p. 416–426]. Finally, DeFalco testified that he complied with Curtis' (as well as the other defendants') extortionate demands because, "I didn't have any choice. It was either that or go bankrupt" [Tr.12/11, p. 407–408]. (Plaintiffs' Brief in Opposition to

the Post–Trial Motions by Dine and Curtis pp. 15–16.)

■ Assuming *arguendo* that Rouis or Curtis committed extortion—a proposition we find unnecessary to analyze—DeFalco still had the obligation to prove adequately that their predicate acts were the proximate cause of RICO damages.

In *Sedima, S.P.R.L. v. Imrex Company, Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) the Supreme Court set forth the essential requirements for recovery for a violation of 18 U.S.C. § 1962(c). These requirements are (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity, and (5) injury to the plaintiff in his business or property by the conduct constituting the violation. *Id.* at 496, 105 S.Ct. at 3285.

> Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of the enterprise "... Any recoverable damages occurring by reason of a violation of § 1962(c) *will flow from the commission of the predicate acts.*" (Emphasis added)

*Id.* at 497, 105 S.Ct. at 3285; *see Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 1317–18, 117 L.Ed.2d 532 (1992).

The requirement that the injury be the product of the conduct constituting the violation assumes particular importance here because "a defendant is not liable for treble damages to everyone he might have injured by conduct other than that prohibited by RICO." *Norman v. Niagara Mohawk Power Corp.* 873 F.2d 634, 636 (2d Cir.1989); *Hecht v. Commerce Clearing House,* 897 F.2d 21 (2d Cir.1990); *see Holmes,* 503 U.S. at 269, 112 S.Ct. at 1318 ("the less direct the injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors.")

In view of the character of the harm RICO was intended to address, the proximate cause requirement fixes a legal limit on individual responsibility, even for wrongful acts. *See Holmes,* 503 U.S. at 268, 112 S.Ct. at 1317–18. At the core of RICO's proximate cause requirement is the concept that a person is not liable to all those whom he may have been injured.

■ Our Court of Appeals has made clear on a number of occasions that courts must be careful to ensure that the RICO acts proximately caused the alleged injury and that the relationship between the event and the claimed damage is a firm one. *See Sperber v. Boesky,* 849 F.2d 60, 63 (2d Cir.1988). More precisely, RICO acts proximately cause injury only "if they are a substantial factor in the sequence of responsible causation and if the injury is reasonably foreseeable or anticipated as a natural consequence." *Hecht,* 897 F.2d at 23–24; *see Bonsignore v. City of New York,* 683 F.2d 635, 637 (2d Cir.1982); Restatement (Second) of Torts §§ 431, 435 comment b (1965).

In *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, (2d Cir.1994) *cert. denied,* 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995) the Court elaborated:

> RICO provides a civil remedy only to those persons injured "by reason of" the defendant's predicate acts. To show that an injury resulted "by reason of" the defendant's action, and therefore to have standing under RICO, the plaintiff must allege "that the defendant's violations were a proximate cause of the plaintiff's injury, i.e., that there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct." *Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.,* 985 F.2d 102, 104 (2d Cir. 1993). "This requires a showing not only that the defendant's alleged RICO violation was the 'but-for' or cause-in-fact of his injury, but also that the violation was the legal or proximate cause." *Id.* at 769 (citations omitted)

In view of these principles, the trial record must contain sufficient evidence upon which a reasonable jury could have concluded that Rouis' and Curtis' commission of the predicate acts caused DeFalco RICO damages.

With respect to Rouis, DeFalco contends that:

"the proof of proximate cause between the plaintiffs' injury and Rouis' pattern of racketeering activity is more than sufficient. Here, aside from the $50,000 to $60,000 that Rouis personally received by what the jury found to be extortion or bribery [Tr.12/18, p. 362], Rouis' predicate acts were proximately responsible for (i) damages flowing from the inability of the [DeFalco] to convey [his] property when the market for the same was at its peak, (ii) damages as a result of the [DeFalco's] inability to complete the development of [his] property; and (iii) the removal of large quantities of sand and gravel from the [DeFalco's] property without compensation. Any one of these damage areas is sufficient to support the jury's proximate finding, however the three in combination overwhelmingly support the jury's determination that there was a direct relationship between [DeFalco's] injury and Rouis' injurious conduct." (Plaintiffs' Memorandum of Law in Opposition to Post–Trial Motion by Defendant Paul Rouis, p. 22).

DeFalco's theory with respect to Curtis is as follows:

With respect to Curtis, his extortionate acts were, at the very least, clearly the proximate cause of the loss sustained by [DeFalco] for the purchase of nursery shrubs (through Ernest Matern) and the funds paid to Glavin. More importantly, Curtis' pattern of racketeering activities as described above (i.e., using, and threatening to misuse, his political position to attempt to compel DeFalco to do whatever the enterprise sought) clearly resulted in further and substantial damages to the plaintiffs. For example, Curtis specifically threatened DeFalco that, unless DeFalco conveyed the balance of the gravel pit to Bernas, there would be no approval of Phase II of the development at all [Tr.12/11, p. 382–383] (and, in fact, Phase II has not been approved to this day) [Tr.12/11, p. 383]. The jury could very reasonably have concluded that this act (one clearly within Curtis' general pattern of illegal racketeering activity) resulted in plaintiffs' inability to complete the development of, at least, Phase II, which obviously resulted in significant damages to [DeFalco]. By way of further example, the jury very well could have concluded that Curtis' pattern of racketeering activities were at least partially responsible for the loss of two sales that [DeFalco] could have made of [the] development (or, at least, of [the] gravel pit). If that is the case, then the jury was extremely conservative and restrained in their award against Curtis. (Plaintiffs' Memorandum of Law in Opposition to Post–Trial Motion by Defendants Dirie and Curtis, pp. 19–20)

Exactly why the jury assessed the damages that it did against Rouis and Curtis remains, of course, unknowable. With deference to the jury's conclusions and to DeFalco's theory, the fact remains there is simply no evidence in this record that could adequately support a reasonable conclusion that the predicate acts found against Rouis and Curtis were the proximate cause of RICO injury to DeFalco.

■ The uncontested evidence at trial was that during his tenure as the Project's accountant, Rouis received $500 per month in accounting fees, which totaled between $15,000 and $16,000. It is not disputed that Rouis was an accountant, that he performed accounting services for the Project, or that the services were reasonable and necessary for such a business enterprise. It is not claimed that the fees were rebated to others, nor is there any proof that the $500 per month did not reflect the value of the services DeFalco admittedly received.

Giving DeFalco the benefit of all inferences on this issue, a jury could have concluded that Rouis insinuated himself into the Project. While DeFalco might have disliked being saddled with an accountant not of his choice, that unfortunate circumstance, regrettable as it might have been, simply does not, as a matter of law, translate into RICO damages. *See Hecht, supra* at 24; *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335 (2d Cir.1994).

■ DeFalco's theory as how the second predicate act caused RICO damages fares no

better. As we have seen, DeFalco contends that Rouis induced him to transfer the JOBO stock to Bernas by recording a phony payable to Bernas and by threatening DeFalco with IRS problems unless the share transfer occurred. Neither the phony payable nor the threat of an IRS audit were the proximate cause of the transfer of stock. Therefore, as a matter of law, these acts did not produce RICO injury.

DeFalco's response is that the damages assessed by the jury could have been calculated based on DeFalco's loss profits from putative sales of portions of the Project to two entities known as Tri-sec and Valente in 1989. DeFalco's theory as to how Rouis was responsible for frustrating the Tri-sec and Valente deals as set forth in his post-trial brief is as follows:

> The evidence established that [DeFalco] at one point, received an offer to sell [the] property (including the JOBO gravel pit) to an entity called Tri–Sec for an aggregate purchase price of $8.3 million [Tr.12/11, p. 342–343; Tr.12/12, p. 485]. The gravel pit itself was to be sold for $2,000,000.00 [Ex. C & D–51; Ex. B–25]. Rouis, however, upon learning of that, threatened to have the Town of Delaware take detrimental action regarding road dedications at [DeFalco's] development if DeFalco went ahead with his plans to sell the gravel pit to Tri–Sec....
>
> Thus, Rouis' extortionate infusion as accountant for [DeFalco's] development project resulted in his ability to (1) know of the prospective sale to Tri–Sec; and (ii) threaten the further misuse of his public office and control of the enterprise to cause the sale not to take place [Tr.12/11, p. 350]. The result was that Rouis "killed" the deal [Tr.12/12, p. 485]. Clearly, the fact that [DeFalco] would lose the profits from that transaction were foreseeable when Rouis acted in the manner that he did. Rouis' actions just in this regard were sufficient to support the jury's damage award against him.
>
> The evidence also established that the defendants (including Rouis) pressured DeFalco into not making another deal to sell a portion of the property [Tr.12/11, p. 352–

356]. This deal was with Louie Valente who agreed to purchase the gravel pit and another 800 acres of [DeFalco's] land ... for a purchase price of $6 million [Tr.12/11, p. 353–354]. Valente and DeFalco entered into a letter agreement for that sale, and Valente tendered a $5,000.00 deposit [Tr.12/11, p. 353]. Again, because of Rouis' predicate acts of compelling [DeFalco] to convey JOBO stock to Bernas, Bernas was placed in a position of being able to take action intended to "kill" this deal as well, which Bernas intentionally did [Tr.12/11, p. 355]. Again, the damages flowing from that (i.e., the loss to [DeFalco] of the profit that [he] would have made from this deal) was clearly foreseeable. (sic) (Plaintiffs' Memorandum of Law in Opposition to Post–Trial Motion by Defendant Paul Rouis, pp. 22–24.)

This theory is analytically inadequate. Neither the retention of Rouis as the Project's accountant nor the transfer of one-third of the shares of JOBO to Bernas could be reasonably concluded to have been the proximate cause of any lost profits from unconsummated sales opportunities. There was no "direct relationship between the plaintiffs' injury and the defendants' injurious conduct." *Standardbred Owners Ass'n,* 985 F.2d at 104; *Hecht,* 897 F.2d at 23–24. Similarly, there was simply no competent proof of any of sort of relationship—much less the requisite proximate cause relationship—between the predicate acts found to have been committed by Rouis and the removal of timber, sand or gravel from the Project. *First Nationwide, supra* at 769. Indeed, there was no adequate proof that Rouis was in any way involved with the removal of timber, sand, or gravel from the Project.

■ The same conclusion is compelled with respect to Curtis. Assuming *arguendo* that DeFalco's purchase of shrubs through Matern or landscape services from Glavin was the product of extortion, the record before the jury was devoid of proof that any injury to DeFalco's business or property resulted. According to trial testimony, Matern was paid $20,000 to $25,000 for the shrubs and Glavin received $1,500 for landscape ar-

chitectural services. DeFalco offered no competent proof that these goods and services were not delivered or not needed or that the amounts DeFalco paid were in excess of the value of the goods and services he received. Consequently, there was no sufficient proof that these payments caused De-Falco RICO damages in any amount, let alone $250,000.

DeFalco insists that the $250,000 damage award against Curtis could be justified on the theory that Curtis facilitated the conveyance of the gravel pit to Bernas by threatening to withhold approvals for the Project and that Curtis' "general pattern of illegal racketeering activity" frustrated the development and the sale of the Project. The difficulty with these theories is twofold. First, this conduct is wholly distinct from the predicate acts Curtis was found to have committed. Second, any relationship between Curtis' predicate acts and DeFalco's inability to develop or sell the Project is entirely speculative and unsupported by the trial record.

In sum, because the trial record affords no basis for a reasonable conclusion that the commission of the predicate acts attributable to Rouis and Curtis—considered singly or in the aggregate—caused damages to DeFalco's business or property, their motions pursuant to Rule 50(b) are granted.

### Post–Trial Motions of Dirie, Bernas, JML Ouarries, Inc., and John Bernas, Inc.

In order to recover damages against any of the defendants, DeFalco was obliged to prove not only a violation of RICO, but the amount of any injury to his property or business by virtue of the RICO violations found to have been committed. *Sedima*, 473 U.S. at 496, 105 S.Ct. at 3285. The rather large amount of damages awarded and the unproven and speculative nature of the damages at issue lead this Court to conclude that unless De-Falco's claims are reconsidered at another trial, a miscarriage of justice will occur.

3. DeFalco paid approximately $960,000 for the land in 1987 and claims to have lost the opportunity to sell the land for approximately $7,300,000 in 1989. However, at the time of the trial DeFalco still owned the land. Consequently the critical issue was not simply the purchase price for

■ DeFalco postulated damages in four general areas. The first was that the conduct of the defendants killed purported deals to sell portions of the Project to two purchasers, Valente and Tri–Sec. The second was that the conduct of the defendants frustrated DeFalco's ability to complete development of the Project. The third was that gravel and sand were, in effect, stolen from his property. The fourth was that timber was also stolen.

Common experience teaches that real estate developments are inherently speculative and that myriad factors—foreseen and unforeseen—can frustrate their completion. DeFalco's proof at trial of the two inchoate land deals was insufficient. There was no testimony to indicate that either of the deals had progressed to the point where any enforceable obligations had been created. No written agreement between DeFalco and Valente was produced at trial. A two page agreement with Tri–Sec was introduced but it was no more than a preliminary document. It contained none of the provisions customarily found in a formal commitment to convey land, much less the sorts of provisions essential to a large, complex real estate transaction of the sort DeFalco claims was contemplated. Moreover, the trial testimony conclusively showed that the purported Tri–Sec agreement was signed not by the purchaser but by DeFalco's secretary. As a result, the proffered documentation did not satisfy the New York Statute of Frauds. *See* N.Y. Gen. Oblig. Law § 5–703(2) (McKinney 1989).[3]

There was no evidence offered at trial to establish adequately the existence of an agreement with respect to either transaction whose consummation DeFalco claims were thwarted. Moreover, there was no adequate proof that the conduct of the defendants actually interfered with either of these purported deals. Assuming, *arguendo*, that De-Falco had entered into purchase and sale agreements, and that the defendants illegally impeded their completion, DeFalco's evidence of any RICO damages was far too

the land, or the value of the contract said to have been frustrated. DeFalco was also obligated to offer satisfactory evidence of the market value of the land at the time of trial. No such evidence was adduced.

speculative and uncertain. Finally, while there was evidence offered at trial tending to prove that the timber, sand and gravel might have been illegally removed from DeFalco's property, proof as to amount was inadequate.

Because DeFalco's wide-ranging and vague theories of RICO injury created a substantial likelihood that the jury's award was based on something other than adequate proof, defendants William Dirie, John Bernas, John Bernas, Inc., and JML Quarries, Inc. will be given a new trial. Because the relationship between damages and liability in this case is a complicated one, a retrial of both issues is required. See *Santa Maria v. Metro–North Commuter Railroad,* 81 F.3d 265, 273 (2nd Cir.1996); *see also Tingley Systems, Inc. v Norse Systems, Inc.,* 49 F.3d 93, 96 (2nd Cir.1995). Had the Court not granted the Rule 50(b) motions of Rouis and Curtis, they too would have been afforded a new trial.

### CONCLUSION

The judgment of this Court entered on January 3, 1997 is vacated. The motions of William Dirie, JML Quarries, Inc., John Bernas, and John Bernas, Inc. for a new trial pursuant to Rule 59 Fed.R.Civ.P. are granted. The motions of Paul Rouis and V. Edward Curtis pursuant to Rule 50(b) Fed.R.Civ.P. are granted and the Clerk of the Court is directed to enter judgment as a matter of law in their favor. All other post-trial motions are denied.

**SO ORDERED**