RED BALL INTERIOR DEMOLITION
CORP. and John Palmadessa,
Plaintiffs,

v.

Daniel PALMADESSA, Donald Palmades-
sa, William Palmadessa, Supreme Recy-
cling, Inc., and Fortune Interior Dis-
mantling Corp., Defendants.

No. 94 Civ. 4158 (RWS).

United States District Court,
S.D. New York.

Nov. 28, 1995.

William Dunnegan, New York City, for Plaintiff.

Gutman & Gutman, Forest Hills, NY (S. Mac Gutman, of counsel), for Defendant Daniel Palmadessa.

Feldman, Gold & Wachtel, Roseland, NJ (Richard Feldman, of counsel), for Defendants Donald Palmadessa, William Palmadessa, Supreme Recycling, Inc. and Fortune Interior Dismantling Corp.

## OPINION

SWEET, District Judge.

Defendant Daniel Palmadessa ("Daniel") has moved for dismissal of the Amended Complaint of plaintiffs Red Ball Interior Demolition Corporation ("Red Ball") and John Palmadessa ("John") pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to plead claims upon which relief can be granted, to Rule 9(b) Fed.R.Civ.P., for failure to plead fraud with sufficient particularity, and to Rule 56(b), Fed.R.Civ.P., for summary judgment.

Daniel has also moved to strike certain allegations, pursuant to Rule 12(f); to dismiss or sever all claims and allegations in the Amended Complaint pertaining to Red Ball Recycling, Inc. ("Red Ball Recycling"), pursuant to Rule 42(b), or, in the alternative, to sever all claims pertaining to Supreme Recycling, Inc. ("Supreme") and Fortune Interior Dismantling Corp. ("Fortune"); to sever all claims pertaining to Secluded Acres Farm, Inc. pursuant to Rule 42(b); and to impose sanctions upon Plaintiffs pursuant to Rule 11.

In addition, Daniel has moved to compel Plaintiffs to relinquish a copy of the transcripts and notes of any deposition given by Avishai Oz ("Oz"); to direct a hearing, if required, to determine the facts surrounding the deposition of Oz; to dismiss the Amended Complaint; and to disqualify William Dunnegan ("Dunnegan"), counsel to Plaintiffs.

Red Ball has moved to disqualify Donald Horowitz, ("Horowitz"), counsel to Daniel, from representing any defendant in this action. Red Ball has also moved to compel Defendants Daniel, Donald Palmadessa ("Donald"), William Palmadessa ("William"), Supreme Recycling, Inc., and Fortune Interior Dismantling Corp. to submit a final pretrial order.

For the reasons discussed below:

1. Daniel's motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) will be denied.

2. Daniel's motion to dismiss for failure to plead fraud with sufficient particularity pursuant to Rule 9(b) will be denied.

3. Daniel's motion for summary judgment pursuant to Rule 56 will be granted in part and denied in part. Specifically, Daniel's motion will be granted with regard to the First Claim, the RICO claim against Daniel; the Second Claim, for common law fraud against Daniel; and those elements of the other claims that pertain to the alleged diversion of funds to Daniel's Horse Farm that occurred prior to June 6, 1988. The motion will be denied with regard to all other claims.

4. Daniel's motion to strike certain allegations will be granted in part and denied in part. Specifically, Daniel's motion will be granted with regard to the allegations concerning settlement negotiations. The motion will be denied with regard to all other allegations.

5. Daniel's motion to sever or dismiss all claims and allegations pertaining to Red Ball Recycling will be denied.

6. Daniel's motion to sever or dismiss all claims and allegations pertaining to Fortune and Supreme will be denied.

7. Daniel's motion for Rule 11 sanctions will be denied.

8. Daniel's motion to compel Plaintiffs to relinquish a copy of the transcripts and notes of any deposition given by Oz will be granted.

9. Daniel's motion for a hearing to determine the facts surrounding the deposition of Oz will be denied.

10. Daniel's motion to dismiss the Amended Complaint in its entirety will be denied.

11. Daniel's motion to disqualify William Dunnegan will be denied.

12. Red Ball's motion to disqualify Donald Horowitz will be granted.

13. Plaintiffs' motion to compel Defendants to submit a final pretrial order will be granted.

### The Parties

Plaintiff John founded the family carting and demolition business which became Red Ball in 1958. He is Red Ball's sole shareholder at present. Defendant Daniel is John's brother and was his partner in several family businesses, including Red Ball. Daniel's sons, defendants Donald and William were employed by Red Ball and later incorporated Supreme and Fortune, both of which are New Jersey corporations.

### Prior Proceedings and Factual Allegations

### I. *Facts Alleged in the Amended Complaint*

As is discussed in detail below, in the face of a Rule 12(b)(6) motion to dismiss, a plaintiff's factual allegations are presumed to be true and all factual inferences are drawn in the plaintiff's favor. Therefore, the factual allegations set forth in this sub-section do not constitute findings of fact by the Court.

John went into the carting business in 1958. He was later joined by Daniel and

they, along with John's wife, Mary Palmadessa ("Mary"), became the only shareholders in their first corporation in 1961. John and Daniel formed Red Ball in 1967. John and Daniel were Red Ball's only shareholders. Red Ball developed into a successful business.

From the late 1970's through 1986, John did not work full-time due to ill-health but shared equally with Daniel in the proceeds of the business. Daniel ran the financial aspects of Red Ball, and its operations were managed by employees. During these years Daniel installed William and Donald and an employee named Anthony Patrizio (who was loyal to Daniel rather than John) in key management positions within Red Ball.

From 1986 to 1993, Daniel mailed to John weekly financial statements regarding, *inter alia*, Red Ball's cash position and officers' loan accounts. Daniel also mailed to John Red Ball's annual financial report. These mailings failed to disclose Daniel's diversion of Red Ball's resources and business opportunities, discussed below.

In 1986, in view of John's failing health, Daniel and John entered into the 1986 Agreement, which required each to secure a life insurance policy on the other in the amount of $3 million, with himself as sole beneficiary. The 1986 Agreement provided that in the event of the death of either brother, the surviving brother would immediately pay the entirety of the life insurance proceeds to the deceased brother's estate in consideration for all of the deceased brother's shares of Red Ball. By the terms of the 1986 Agreement, sale of the deceased brother's shares by his estate for the $3 million insurance proceeds was mandatory.

At some time prior to November of 1987, Daniel began diverting labor and other assets of Red Ball to the improvement of a farm he owns in West Milford, New Jersey (the "Horse Farm"). By November 1987, Daniel had diverted more than $1.7 million from Red Ball to the improvement of the Farm.

In 1988, Daniel caused Red Ball to cease paying John's salary, which was John's only form of income from Red Ball. Also in 1988,

Daniel had Mary, John's wife, ejected from Red Ball's corporate offices when she inquired into Red Ball's finances.

Also in 1988, Daniel caused the illegal dumping of debris at Secluded Acres Farm ("Secluded Acres"), a property adjacent to Daniel's Horse Farm. The debris came from the Horse Farm, and some may have come originally from the premises of Red Ball. Daniel was responsible for the dumping at Secluded Acres and knew that it was unlawful. The New Jersey Department of Environmental Protection (the "DEP") investigated the Secluded Acres site and commenced an administrative action against Daniel and Red Ball (the "DEP Action"). In addition, Daniel and Red Ball were indicted on criminal charges related to the dumping at Secluded Acres.

On December 9, 1988, after the indictment, Horowitz met with Daniel, and Daniel requested that Horowitz represent him and Red Ball in the criminal litigation. Horowitz asserts that he was never involved in litigating or considering the merits of the Secluded Acres Action. Instead, he sought an administrative consent order, or pretrial diversion (a "PTI"), for Daniel and Red Ball. In entering into the PTI, Daniel, seeking to divest himself of responsibility for the incident, obligated Red Ball for the costs of remediation of Secluded Acres, divesting himself of responsibility. Red Ball has expended over $100,000 to remediate the Secluded Acres site and to pay legal fees.

John instituted a proceeding seeking the court-ordered dissolution of Red Ball in New York State Supreme Court on January 30, 1989, alleging fraud and deadlock of directors. *In the Matter of the Petition of John Palmadessa, Petitioner, For the Dissolution of Red Ball Interior Demolition Corporation, Pursuant to Sections 1104 and 1104–A of the BCL, and Daniel Palmadessa, Respondents,* Index No. 1856/89. S. Mac Gutman ("Gutman"), counsel to Daniel in this action, represented both Red Ball and Daniel in that action. That action was dismissed on October 20, 1989.

At the same time, John instituted two related proceedings in the same court: *In the Matter of the Petition of John Palmadessa,*

*Petitioner, For the Dissolution of United City Contractors Co., Inc., Pursuant to Secs. 1104 and 1104–A of the BCL, and Daniel Palmadessa, Respondents,* Index No. 02094/89, in which Gutman represented United City and Daniel, and *In the Matter of the Petition of John Palmadessa, Petitioner, For the Dissolution of Palma Terminal, Inc., Pursuant to Secs. 1104 and 1104–A of the BCL, and Daniel Palmadessa, Respondents,* Index No. 02095/89, in which Gutman represented Palma and Daniel. (These three proceedings are referred to as "the Dissolution Actions".)

In the course of the Dissolution Actions, Daniel denied under oath that any expenses had been improperly incurred and blamed the increased costs to which John's petitions referred on the rising cost of dumping.

Subsequent to the New York court's dismissal of the Red Ball Dissolution Action, and while a motion to reargue was pending, the parties negotiated toward a settlement in which Daniel would purchase John's shares in Red Ball. John and Daniel were unable to close the transaction, because Daniel would not negotiate in good faith, seeking to pay John less than they had agreed.

At the end of 1989, the parties came to another agreement, pursuant to which Daniel would purchase John's shares in the jointly owned corporations. Again, although John and Daniel attempted to close the transaction, they were unable to do so, because Daniel would not negotiate in good faith.

For some period of time prior to 1989, William and Donald, Daniel's sons, operated Sunset in competition with Red Ball while still on the Red Ball payroll. Daniel knew of and permitted this activity.

On February 23, 1990, John and Daniel entered into a revised shareholders agreement, pursuant to which John would sell his shares in the corporations they owned jointly, including Red Ball, for a total of $4.4 million, provided certain conditions were met. Daniel later cancelled that agreement.

In March 1990, John borrowed $232,000 from Red Ball's bank accounts, charging the withdrawals to John's officers' loan account.

Daniel commenced an action for injunctive relief against John in New York State Supreme Court on April 3, 1990, related to John's March loan. That action was removed to this Court, *Palmadessa v. Palmadessa*, 90 Civ. 2429 (RJW), and John again sought dissolution of Red Ball through a counterclaim in that action. John was represented by Dunnegan, counsel to John and Red Ball in this action. During the course of that litigation, Daniel sought to regain John's trust and to undermine John's trust in John's attorneys.

In 1990, pursuant to that litigation and under the supervision of the Honorable Robert J. Ward, Daniel and John executed an amendment (the "1990 Amendment") to the 1986 Agreement. That Amendment required that they receive equal regular salary payments from Red Ball, and that, in the event of the death of either brother, sale of the deceased brother's shares in Red Ball would be only at the option of both parties, rather than mandatory, as had been required by the terms of the 1986 Agreement. This Amendment gave Daniel an incentive to reduce, rather than to increase, the value of Red Ball.

At this time, John believed that Daniel desired to deal with John in good faith, and John trusted Daniel. In fact, Daniel had agreed to the 1990 Amendment to avoid the judicial dissolution of Red Ball, with the ultimate goals of fraudulently embezzling money and property from Red Ball and transferring ownership of Red Ball to his sons, excluding John's family.

To accomplish this goal, Daniel sought to embezzle money and property from Red Ball to weaken its financial condition, in order to pressure John to sell his shares to Daniel at deflated prices. Among the actions taken by Daniel to accomplish this goal was his displacement of his own responsibility for remediation of the Secluded Acres site, described above, onto Red Ball. In addition, Daniel sought further to reduce the value of Red Ball by refusing to negotiate the rent demanded by the landlord of Red Ball's transfer station, by overpaying its workers, and by undercharging its customers.

In October 1991, Red Ball was in the process of terminating its pension plan, the Red Ball Pension Trust (the "Pension Trust"). Because they were of different ages, John was entitled under federal law to receive a larger distribution from the Pension Trust than Daniel. Daniel asked John to give Daniel a bonus equal to the difference between the distribution that John and Mary would receive over that which Daniel and his wife, Jacqueline, would receive. John agreed to pay Daniel that bonus, providing that the federal tax on the overfunding of the Red Ball Pension Trust was paid before Daniel received the bonus. John and Daniel therefore executed a unanimous consent of the Directors of Red Ball on or about November 7, 1991, to that effect. The amount agreed to was $492,892. On January 28, 1992, Daniel transferred $478,093 from the Pension Trust account to Red Ball's account. At the same time, he wrote a check for the same amount from Red Ball's account to his personal account. No federal tax was paid on that distribution. Red Ball is the successor in interest to the Pension Trust, which has been dissolved.

Having achieved his goal of embezzling sufficient money and property from Red Ball to seriously weaken its financial condition, Daniel then attempted to persuade John to sell his shares at an unreasonably low price. During a meeting in December 1991, and in several telephone conversations before and after it, Daniel discussed with John the financial condition of Red Ball and the reasons for its declining financial condition. Daniel cited the increased cost of the rent on the transfer station as one of the reasons. Daniel failed to disclose at this time to John that he had fraudulently embezzled the money and property of Red Ball as a part of his scheme to buy John's shares in Red Ball for an unreasonably low amount.

During that meeting, Daniel offered to purchase John's interest in the jointly owned corporations, including Red Ball, for $2.5 million, far less than he had offered in December 1989, and $2 million less than the minimum price set in the 1990 Amendment. John refused the offer and offered to purchase Daniel's interest in the jointly owned

corporations for the same amount. Daniel refused to sell at that price. To pressure John to sell his shares at a low price, Daniel then cut John's salary from $5,000 per week to $1,000 per week.

On August 11, 1992, during the pendency of *Palmadessa v. Palmadessa*, Judge Ward issued an Order (the "August 1992 Order") adjudging Daniel in contempt of Court with regard to the 1990 Amendment for cutting off John's salary. Daniel was ordered to cause Red Ball and the other corporations owned by him and John to pay each of the two brothers a salary of $3,000 per week. During the course of the proceedings leading to this Order, Daniel swore that the financial condition of Red Ball justified the decrease in salaries.

Daniel repeatedly proposed to John that they wind down Red Ball and give each of their sons one-third of the company: to Daniel's sons, William and Donald, and to John's son, Douglas. John rejected this proposal several times as inequitable. In an effort to legitimize his proposal, Daniel caused Gutman, Red Ball's attorney at that time, to draft a letter to both John and Daniel suggesting that the corporation be wound down in the manner Daniel had proposed. John once again refused.

On October 24, 1991, Daniel's son William, at the direction of Daniel, incorporated Recycling under the laws of the State of New York. William and Daniel anticipated that William would use this corporation to take over the business of Red Ball in the manner described in Gutman's letter, except that John's children would be excluded from the new corporation. Daniel and William concealed the existence of Recycling from John, and John did not learn of its existence until this action was commenced.

Prior to June 2, 1993, Daniel met several times with John, during which meetings Daniel sought to gain John's trust. Daniel did not disclose to John during these meetings that Daniel had helped to divert business to Supreme and Fortune. On June 2, 1993, as a result of these meetings, Daniel persuaded John to sign a document that the former had prepared, agreeing to put up certain properties for sale, to complete the jobs currently underway, and not to pursue any further business. The agreement also stated that "Douglas, Willie and Donald will be free to do whatever they want to do, where ever [*sic*] and however they want to do it." John would not have signed the document had Daniel disclosed to him the fact that Daniel had been diverting business to Daniel's sons, that Daniel's sons were standing ready to take over the operating business of Red Ball, and that Daniel believed that there was a profitable business in the interior demolition business and was, in fact, financing his sons in taking advantage of that opportunity. In the months after this agreement was signed, Daniel diverted several other Red Ball resources and potential customers to Supreme and Fortune.

On July 10, 1993, Daniel directed William to incorporate Supreme and Fortune under the laws of New Jersey. However, Daniel did not allow Fortune and Supreme to begin operations at that time, because of the pendency of the contempt proceeding before Judge Ward. On or about January 1993, after the completion of the contempt proceeding, Daniel lent William money to begin operations, and Daniel then, in a further effort to oust his brother and to enrich himself and his sons, began to subcontract Red Ball's work to Fortune and Supreme, without John's knowledge, thereby reducing Red Ball's profitability and diverting profitable opportunities to the benefit of Daniel's sons alone, without an opportunity for John to share in that benefit.

John's counterclaim for dissolution in *Palmadessa v. Palmadessa* was ultimately resolved when, on June 2, 1994, John purchased all of Daniel's Red Ball shares, in addition to other of Daniel's assets, for $1.2 million in cash and notes. That action was closed on September 23, 1994. The Initial Complaint in this action was filed four days after John's purchase of Daniel's shares, on June 6, 1994. Red Ball and John filed the Initial Complaint in this action as related to *Palmadessa v. Palmadessa*. On June 24, 1994, Judge Ward declined to accept this case as related to *Palmadessa v. Palmadessa*.

## II. *Factual Allegations Concerning Horowitz*

The parties offer conflicting sets of facts with regard to the involvement of Horowitz in the administrative action following the dumping at Secluded Acres. Certain facts are not in dispute. After the DEP took action against Daniel and Red Ball, as described above, Horowitz undertook to aid in representing Red Ball, in conjunction with Gutman; Halima Akhtar–Gutman ("Akhtar–Gutman"), Gutman's associate; and Michael Elder ("Elder"), an environmental attorney retained by Red Ball.

During the course of that representation, Daniel alleges, Horowitz became aware of the identities of three witnesses who could testify that John knew about the dumping at the Horse Farm at the time it occurred. Daniel alleges that Horowitz has, in connection to this Action, failed to disclose the identities of these individuals to Defendants or their counsel. Horowitz asserts that he served in a limited capacity. In discussions with the DEP, he declares, Red Ball was represented by Elder and by Akhtar Gutman. He served only as criminal attorney to Daniel and Red Ball, in aiding them to work to escape criminal indictment. In the course of that representation, he attended some of the meetings with DEP personnel, and he was involved in transmitting some documents.

As a result of the combined representation, as noted above, both Red Ball and Daniel escaped criminal prosecution. An administrative consent order placed the burden of remediating Secluded Acres on Red Ball, not on Daniel.

Horowitz asserts that during the course of representing Daniel and Red Ball in the course of this criminal investigation, he did not conduct an investigation of the case, nor did he receive any confidential information from either Red Ball or Daniel about the facts of the case. He asserts that any knowledge of John's involvement in the dumping at the Farm was gained during his representation of Daniel in the instant case, not from the prior litigation.

Daniel asserts that Horowitz retained certain documents related to this action. Horowitz claims that he does not have any documents relating to the matter.

Horowitz has never represented John in the latter's capacity as an individual, and he has never seen, met, or conversed with John. Horowitz asserts that despite the fact that John's first petitions for judicial dissolution were brought less than one month after Daniel signed Horowitz's retainer agreement, Horowitz was not advised of the action for dissolution and was completely unaware of the friction between John and Daniel.

Horowitz and Dunnegan spoke by telephone on January 3, 1990. At that time, Daniel alleges, Dunnegan did not advise Horowitz of the friction between John and Daniel, thus alerting him to the potential for a conflict of interest. Daniel alleges further that Dunnegan deluded Horowitz into continuing to believe that his continuing to represent Red Ball and Daniel prior to their settlement of the criminal matter was free from conflicts of interest.

Dunnegan and Horowitz met on January 5, 1995, to discuss settlement of this case. Dunnegan did not take immediate action to disqualify Horowitz.

## III. *Factual Allegations Concerning Dunnegan*

On May 15, two days after Judge Ward denied Daniel's motion to set aside the offer of settlement, Oz moved documents from Red Ball's offices at 575 Washington Street ("Washington Street") to Red Ball's offices in New Jersey. Daniel has declared that at that time, no original documents were removed from the premises. Plaintiffs allege that Daniel, William, and three unidentified others destroyed a number of documents supporting Plaintiffs' allegations. A bill of lading was prepared by Oz's company, reflecting the May 15 move.

Oz is the owner of O.Z. Moving & Storage Co. ("O.Z.", alternatively referred to by the parties' documents as "On Time"). Oz began working for Daniel soon after his immigration to the United States from Israel in 1986, beginning by cleaning stalls at the Horse

Farm. Two weeks later, Oz became manager of the Horse Farm. Later, Oz became a tenant of Red Ball's at Washington Street.

During the course of discovery proceedings related to this action, Oz was identified by Daniel as an intended witness in light of Oz's knowledge surrounding the move, which he under took at Daniel's behest. By notice of deposition dated and served on July 10, 1995, and by subpoena dated July 5, 1995, Plaintiffs scheduled the deposition of Oz. Daniel alleges that Gutman was never served with a copy of that subpoena. By a subsequent stipulation among counsel, the parties agreed that the number of depositions to be taken would be limited. Oz was not included in the list of parties to be deposed.

Plaintiffs allege that they notified Oz that his deposition had been cancelled. In the course of doing so, they allege, they learned that Oz had personal knowledge concerning the alleged removal and destruction of Red Ball's documents during the move from Washington Street to New Jersey. They assert that Oz was aware that the subpoena no longer compelled him to testify at that time and that Oz was particularly disinclined to become enmeshed in this dispute, because he had a strong dislike for John. That animosity, Plaintiffs allege, sprang from a dispute over the termination of Oz's tenancy at the Washington Street property. Dunnegan states that Oz told him that Oz would be willing to tell the truth if John and Red Ball would remedy the damages that Oz claimed John had caused by removing Oz from his tenancy at 575 Washington Street on short notice and if John and Red Ball would compensate him for his time in giving the sworn statement. Although he and Oz did not negotiate an amount, states Dunnegan, they scheduled an appointment for July 20, 1995.

On July 20, 1995, Oz went to Dunnegan's office. Daniel alleges that Oz went there in response to the subpoena, and Oz's declaration confirms that allegation. A court reporter was present at Dunnegan's office. Neither Gutman nor any of the Defendants was present. Dunnegan declares that Oz asked at that point whether he would be endangering himself by making a statement. Dunnegan responded, by his own account,

that "on February 20, 1990, Daniel had threatened to break my legs if John withdrew any money that day from the Union Chelsea Bank, but that nothing ever happened to me," and that Dunnegan "planned to send [his] family away for the duration of the trial." Plaintiffs and Dunnegan allege that at Dunnegan's office, Plaintiffs entered into an agreement with Oz, signed by both of them, that required him to surrender his claim against Red Ball concerning his former tenancy at Washington Street and to provide a truthful statement under oath.

A check from Dunnegan's trust account was made payable to Oz in the amount of $6,000, which amount, Plaintiffs allege, was in accordance with the agreement. In the course of his deposition, Oz set forth several facts regarding Daniel's alleged use of Red Ball labor at the Farm, the facts underlying the action surrounding the Secluded Acres dumping, and the move from Washington Street. According to Dunnegan's declaration, Oz picked up the deposition transcript from Dunnegan's office the next morning, read the transcript over the weekend, and signed it before a notary public on Monday, July 24, 1995.

John has provided a typewritten document, signed by Oz and John, reflecting the terms of this agreement. It includes language that: "If anything 'happens' to Avi, Red Ball and John Palmadessa will use reasonable efforts to assist Oz, as determined by William Dunnegan."

Plaintiffs allege that Oz's wealth of personal knowledge subsequently caused them to enter into an oral agreement with Oz to assist Plaintiffs in identifying additional documents and witnesses. Gutman declares that Oz asked for payment for doing so. In accordance with this agreement, Plaintiffs allege, they paid Oz an advance fee of $3,500. A check in that amount was drawn to Oz on Dunnegan's trust account, dated "Not before July 31, 1995." It contained the memorandum "per agreement re: documents."

On August 8, 1995, Daniel and Gutman met with Oz at his office. In the course of that meeting, someone other than Oz wrote out by hand, and Oz signed, a declaration

that Dunnegan "promised to pay me $6,000 to cooperate in the deposition"; that John had told him that "Danny is a mafia; he has people who will hurt you; he'll kill you," and that Dunnegan "gave me $3500 to sent my wife away and protect her from Danny's people. I collected a total of $9,500." Dunnegan denies that he or John made such statements.

Daniel alleges further that besides the statements in Oz's affidavit, Oz told Gutman and Daniel during the August 8 meeting that he had been paid the $6,000 to settle Oz's dispute over his moving company's eviction from Washington Street. However, alleges Daniel, O.Z. did not have a lease at Washington Street, and Oz told Daniel that no lawsuit had ever been undertaken, nor did Oz have any intent to sue John. Daniel avers that Oz received a release from Dunnegan.

Daniel asserts that Oz told him that Oz had genuinely feared Dunnegan's and John's suggestions that Oz's family was in danger from Daniel.

Gutman declares that Oz told him on August 15, 1995, that he had not read the document before signing it, and that the statements attributed to John were not made. Daniel alleges further that Oz did not read his declaration before signing it, but presents no evidence supporting this allegation. John and Dunnegan deny that the statements attributed to John were made at the meeting.

## IV. *Prior Proceedings in This Action*

In their Initial Complaint in this action, Plaintiffs asserted claims pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(b)–(d) (1984 & Supp.1994) ("RICO"), and for wire fraud, 18 U.S.C. § 1343, against all Defendants, as well as claims for common law fraud, breach of fiduciary duty, conversion, breach of contract, and repayment for goods and services wrongfully appropriated against various combinations of the Defendants. Plaintiffs assert diversity jurisdiction in addition to their federal question. Defendants filed an Answer on August 5, 1994.

On January 18, 1995 (in the "Opinion"), this Court granted a motion by Defendants to dismiss as to Plaintiffs' First (RICO) and Second (Common Law Fraud) Claims and as to that element of Plaintiffs' Third (Breach of Fiduciary Duty) Claim which pertained to Daniel's alleged permitting or allowing his sons to conduct the businesses of Sunset, Fortune, and Supreme. *Red Ball Interior Demolition Corp. v. Palmadessa* ("*Red Ball I* "), 874 F.Supp. 576 (S.D.N.Y.1995) (Sweet, J.). The element of Plaintiffs' Third Claim which pertained to the alleged diversion of resources and businesses to Fortune and Supreme was not dismissed, nor was summary judgment granted regarding that element of the Third Claim. The Opinion also denied Plaintiffs' motion for summary judgment on the Seventh Claim (for repayment of debt) and Eighth Claim (for intentional refusal to pay moneys owed). Finally, the Opinion also denied Defendants' motion for summary judgment on all of the claims.

Plaintiffs submitted their Amended Complaint on February 14, 1995. Daniel answered on February 27, 1995, and also submitted a counterclaim against Red Ball, to which Red Ball replied on March 14, 1995. On April 3, 1995, Donald, William, Supreme, and Fortune answered the Amended Complaint and submitted a counterclaim against Red Ball and John.

Red Ball filed its present notice of motion to disqualify Horowitz on July 6, 1995. On July 25, Daniel filed motions to dismiss pursuant to Rules 12(b)(6) and 9(b), for summary judgment pursuant to Rule 56(b), to strike allegations pursuant Rule 12(f), to dismiss or sever all claims and allegations in the Amended Complaint pertaining to Recycling pursuant to Rule 42(b), to sever all claims pertaining to Secluded Acres pursuant to Rule 42(b), and for sanctions pursuant to Rule 11. Opposition and reply papers were filed and these motions were deemed fully submitted at oral argument on August 2, 1995. Post-argument letters were submitted by Plaintiffs on August 4, by Daniel on August 7, and by the remaining defendants on August 8.

On August 29, 1995, Daniel filed a notice of motion to compel plaintiffs to turn over a

copy of the transcripts and notes of any deposition given by Oz, directing a hearing, if required, to determine the facts surrounding his deposition, to dismiss Plaintiffs' Amended Complaint, and to disqualify Dunnegan. Opposition and reply papers were filed and those motions were deemed fully submitted at oral argument on September 6, 1995. Post-argument affidavits and memoranda were filed by Daniel on September 7 and September 15, and by Plaintiffs on September 11.

### Discussion

#### I. *Legal Standards*

##### A. *Rule 12(b)(6)*

On a Rule 12(b)(6) motion to dismiss, the factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in the plaintiffs' favor and against the defendants. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *Dwyer v. Regan,* 777 F.2d 825, 828–29 (2d Cir.1985). Accordingly, the factual allegations set forth and considered herein are taken from the Plaintiffs' Complaint and do not constitute findings of fact by the Court. They are presumed to be true only for the purpose of deciding the present motion to dismiss.

Rule 12(b)(6) imposes a substantial burden of proof upon the moving party. A court may not dismiss a complaint unless the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

In cases in which Rule 12(b)(6) has been applied to claim of a RICO pattern, plaintiffs have been required to allege multiple predicate acts which constitute a pattern of racketeering activity in that they satisfy the requirements of relationship and continuity. *See H.J.,* 492 U.S. at 250, 109 S.Ct. at 2906. A civil RICO plaintiff must establish that defendants "conduct[ed] or participate[d] . . . in the conduct of [an] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Racketeering activity includes a variety of criminal acts, including mail and wire fraud. 18 U.S.C. § 1961(1). The elements of a "pattern of racketeering activity" are not well defined. At a minimum, plaintiffs must demonstrate "at least two acts of racketeering activity" within a ten year period. 18 U.S.C. § 1961(5); *see McLaughlin v. Anderson,* 962 F.2d 187, 190 (2d Cir.1992).

In order to establish standing to undertake a civil action under RICO, it must be shown that Plaintiff's harm was proximately caused by the RICO predicate acts alleged, *i.e.* that there was a direct relationship between plaintiff's injury and the defendant's conduct. *See First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 728, 130 L.Ed.2d 632 (*quoting Standardbred Owners Ass'n v. Roosevelt Raceway Assocs.,* 985 F.2d 102, 104 (2d Cir.1993)); *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 25 (2d Cir.1990). This requires a showing not only that the defendant's alleged RICO violation was the "but-for" or cause-in-fact of his injury, but also that the violation was the legal or proximate cause. *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 265–70, 112 S.Ct. 1311, 1316–19, 117 L.Ed.2d 532 (1992); *Standardbred Owners,* 985 F.2d at 104; *Hecht,* 897 F.2d at 23.

Failure to adequately allege that defendant's RICO predicate acts proximately caused plaintiff's injury is a defect of pleading and is grounds for dismissal at the pleading stage. *See First Nationwide,* 27 F.3d at 769.

##### B. *Rule 9(b)*

Rule 9(b), Fed.R.Civ.P., requires that in all allegations of fraud, the circumstances constituting the fraud must be stated with particularity. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir.1994); *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 265 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70; *Shem-*

tob v. Shearson, Hammill & Co., 448 F.2d 442, 444–45 (2d Cir.1971). The pleading must be sufficiently particular to serve the three goals of Rule 9(b) which are (1) to provide a defendant with fair notice of the claims against him; (2) to protect a defendant from harm to his reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits. *See Di-Vittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987); *O'Brien v. Price Waterhouse,* 740 F.Supp. 276, 279 (S.D.N.Y.1990), *aff'd,* 936 F.2d 674 (2d Cir. 1991).

The Court of Appeals has required that allegations of fraud adequately specify the statements made that were false or misleading, give particulars as to the respect in which it is contended that the statements were fraudulent, and state the time and place the statements were made and the identity of the person who made them. *See McLaughlin,* 962 F.2d at 191; *Cosmas,* 886 F.2d at 11. Further, it is said that in the RICO context, allegations of fraud must indicate what the defendant obtained as a consequence of the fraud. *See Conan Properties v. Mattel, Inc.,* 619 F.Supp. 1167, 1172 (S.D.N.Y.1985); *Todd v. Oppenheimer & Co.,* 78 F.R.D. 415, 420–21 (S.D.N.Y.1978). Finally, the Court of Appeals has held that a complaint charging fraud must assert that defendant possessed an intent to defraud or, at minimum, allege circumstances from which an inference of such intent could be drawn. *See Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled on other grounds by United States v. Indelicato,* 865 F.2d 1370 (2d Cir.1989).

■ Conclusory allegations of wrongdoing do not satisfy the requirements imposed by Rule 9(b). Some courts have interpreted the Rule to require that the complaint set forth (i) precisely what statements were made in what documents or oral representations or what omissions were made, (ii) the time and place of each such statement or omission and the person responsible for making it, (iii) the content of such statements and the manner in which they misled, and (iv) that which the defendants obtained as a consequence of the fraud. *Todd,* 78 F.R.D. at 420–21; *see also*

*Savino v. E.F. Hutton & Co.,* 507 F.Supp. 1225, 1232 (S.D.N.Y.1981); *Troyer v. Karcagi,* 476 F.Supp. 1142, 1149 (S.D.N.Y.1979); *Gross v. Diversified Mortgage Inv.,* 431 F.Supp. 1080, 1087 (S.D.N.Y.1977), *aff'd sub nom., Duban v. Diversified Mortgage Inv.,* 636 F.2d 1201 (2d Cir.1980).

■ The plaintiff's complaint must give notice to each defendant of its alleged misconduct. To this end, the complaint may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled to be appraised of the circumstances surrounding the fraudulent conduct with which he individually stands charged. *Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 522 n. 7 (S.D.N.Y.1977). This requirement facilitates the preparation of an adequate defense while protecting a defendant's reputation from groundless accusations. *See de Atucha v. Hunt,* 128 F.R.D. 187, 189 (S.D.N.Y.1989), *aff'd,* 979 F.2d 846 (2d Cir. 1992); *Posner v. Coopers & Lybrand,* 92 F.R.D. 765, 768 (S.D.N.Y.1981), *aff'd,* 697 F.2d 296 (2d Cir.1982). It also serves to prevent the abuse of process and the disruption of the gratuitous defendant's normal business activity. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 740–41, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539 (1975).

■ There are five elements necessary to sustain a claim in fraud under New York law: (1) misrepresentation of a material fact; (2) the falsity of that misrepresentation; (3) scienter, or intent to defraud; (4) reasonable reliance on that representation; and (5) damage caused by such reliance. *May Dep't Stores Co. v. International Leasing Corp.,* 1 F.3d 138, 141 (2d Cir.1993); *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970–71 (2d Cir.1987); *Jo Ann Homes v. Dworetz,* 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 250 N.E.2d 214 (1969).

### C. *Rule 56*

The Rule 56 motion for summary judgment is "an integral part" of the Federal Rules of Civil Procedure and facilitates the overall purpose of the Rules as stated in Rule 1, namely, "to secure the just, speedy and

inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). A motion for summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Silver v. City Univ. of New York,* 947 F.2d 1021, 1022 (2d Cir.1991).

The Second Circuit has repeatedly noted that "[a]s a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (citing *Celotex,* 477 U.S. at 330 n. 2, 106 S.Ct. at 2556 (Brennan, J., dissenting) and *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)); *see United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Cartier v. Lussier,* 955 F.2d 841, 845 (2d Cir.1992); *Burtnieks v. City of New York,* 716 F.2d 982, 983–84 (2d Cir.1983). If, when "[v]iewing the evidence produced in the light most favorable to the nonmovant ... a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991).

### D. *Disqualification*

Motions to disqualify are generally disfavored, because they are often made for tactical reasons. *Board of Education v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979). The party seeking to disqualify another's attorney bears the burden of establishing the need for disqualification. *Evans v. Artek Sys. Corp.,* 715 F.2d 788, 794 (2d Cir.1983); *Stratagem Dev. Corp. v. Heron Int'l N.V.,* 756 F.Supp. 789, 792 n. 8 (S.D.N.Y.1991) (Kram, J.); *Rosman v. Shapiro,* 653 F.Supp. 1441, 1444, n. 5 (S.D.N.Y.1987) (Sprizzo, J.).

However, any doubt as to the existence of a conflict of interest should be resolved in favor of disqualification. *Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir.

1975); *Bennett Silvershein Assocs. v. Furman,* 776 F.Supp. 800, 802 (S.D.N.Y.1991) (Mukasey J.). As a general rule, disqualification is necessary when an attorney's successive representation of adverse interests raises the possibility that in the present matter that attorney will improperly use confidences gained in the prior representation to the detriment of the former client. For instance, Disciplinary Rule 5–108 of the New York Code of Professional Responsibility provides:

> Except with the consent of a former client after full disclosure a lawyer who has represented the former client in a matter shall not:
>
> 1. Thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client.

*See also United States Football League v. National Football League,* 605 F.Supp. 1448, 1452 (S.D.N.Y.1985).

Thus, under the "successive representation" test, an attorney should be disqualified from representing a client in a particular case if:

> (1) the moving party is a former client of the adverse party's counsel;
>
> (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and
>
> (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*See Evans,* 715 F.2d at 791 (*citing Cheng v. GAF Corp.,* 631 F.2d 1052, 1055–56 (2d Cir. 1980), *judgment vacated on other grounds,* 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327; *Emle Indus., Inc. v. Patentex, Inc.,* 478 F.2d 562, 570–71 (2d Cir.1973); *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.,* 113 F.Supp. 265, 268 (S.D.N.Y.1953)).

## II. The Motion for Summary Judgment Dismissing the Wire, Mail, Pension, and Common Law Fraud Claims Will Be Granted

### A. The Motion for Summary Judgment Dismissing the Federal and Common Law Fraud Claims Will Be Granted

The RICO claim in the Amended Complaint is based on two categories of acts. First, Plaintiffs allege that Daniel engaged in a pattern of wire and mail fraud. The wire and mail fraud allegedly consisted of Daniel's coordinated scheme to defraud Red Ball by embezzling its assets and by using the mails and the telephone to further that scheme. Plaintiffs allege that Red Ball was directly injured by these acts of wire and mail fraud. The acts of embezzlement also underlie Plaintiffs' claim of common law fraud.

Plaintiffs further base the RICO claim on allegations that Daniel committed an act of pension fund embezzlement in violation of 18 U.S.C. § 664, which is listed as a predicate act for RICO. 18 U.S.C. § 1961.

The Opinion noted that:

> In order to state a claim in [common law] fraud, John must show not only that he reasonably believed Daniel's description of the status of Red Ball, including his omissions of material facts, but also that he was justified in taking action in reliance thereon. *See Lanzi v. Brooks,* 388 N.Y.S.2d 946, 948 (3d Dept.1976), *aff'd,* 43 N.Y.2d 778 (N.Y.1977). John has failed to proffer a credible explanation as to how he could have reasonably relied upon Daniel's alleged material omissions....

▮ In his deposition, to the question "So, would it be true that for at least five to six years prior to 1992, you did not trust your brother?", John answered, "That is correct." Given this statement, none of the evidence adduced by John could lead a reasonable finder of fact to believe that John reasonably relied on Daniel's representations during the period in question. Therefore, the motion for summary judgment with regard to common law fraud claims will be granted.

In *Metromedia v. Fugazy,* 983 F.2d 350, 368 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662, our Court of Appeals held that the plaintiffs must have relied on fraudulent representations for a claim of mail fraud to arise. Plaintiffs assert that because, as restated, their mail and wire fraud claims are based on Daniel's acts of embezzlement, this standard does not apply. Plaintiffs have adduced no controlling law to this effect, and this Court is unable to find any. Thus, the motion for summary judgment will be granted as well with regard to the mail and wire fraud claims.

### B. The Motion for Summary Judgment on the Pension Fund Embezzlement Claim Will Be Granted

Daniel argues further for summary judgment dismissing Plaintiffs' claim that Daniel embezzled from the pension funds, which is listed as another predicate act underlying the RICO claim. That motion will be granted, since a genuine issue of material fact is not presented.

▮ The claim of pension embezzlement is based on Plaintiffs' allegations that although a corporate resolution had authorized payment to Daniel from the pension fund, that payment was conditional on Daniel's payment of tax on the reversion amount. Because Daniel did not pay these taxes, Plaintiffs argue, his actions constituted embezzlement under 18 U.S.C. § 664, which makes criminal conversion of assets from a pension fund.

However, the documentary evidence adduced by Daniel, as well as John's deposition testimony, establishes that Red Ball paid Daniel's bonus by agreement of the shareholders from reversion funds properly returned by the pension fund to the corporation, and not from plan assets, and that the excise tax payable by the corporation on funds reverted from the plan was a corporate, not a plan obligation. 28 U.S.C. § 1334(d); 26 U.S.C. § 4980. John testified that he agreed that Red Ball would pay Daniel a bonus to equalize the vested interests that favored John and Mary. John also signed the corporate resolution that evidenced the shareholders' recognition that Red Ball would receive a reversion from the Pension Fund's overfunded assets, and that the corporation should pay the bonus to Dan-

iel to equalize the benefits. The reversion funds applied by Red Ball to pay Daniel were corporate, not plan assets, and Daniel's receipt of the bonus was not embezzlement from pension and welfare funds. Thus, although there may be a breach of contract or of fiduciary duty claim based on these actions, there is no claim for embezzlement of the pension benefits.

Summary judgment will, therefore, be granted, dismissing the pension fund embezzlement claim.

### C. The Motion for Summary Judgment Dismissing the RICO Claim Will Be Granted

A civil RICO claim is stated only where a pattern of racketeering activity is alleged. 18 U.S.C. § 1964. Because the claims arising from the alleged predicate acts underlying the RICO claims will be dismissed, the RICO claim will be dismissed as well.

### III. The Motion to Strike Prejudicial Allegations Will Be Granted in Part and Denied in Part

Rule 12(f), Fed.R.Civ.P., authorizes a court to strike from a complaint "any redundant, immaterial, impertinent, or scandalous matter." *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir.1976) (striking reference to SEC rulings); *Cooper v. North Jersey Trust Co.*, 10 Fed.R.Serv.2d (Callaghan) (S.D.N.Y.1966) (striking reference to pending indictment); *Independent Theatres, Inc. v. American Broadcasting—Paramount Theatres, Inc.*, 179 F.Supp. 489, 489–90 (S.D.N.Y.1959) (striking references to prior decree). Only the allegation regarding the settlement negotiations, described below, will be stricken. The others will be retained.

### A. The Allegations Concerning the Prior Contempt Order Will Not Be Stricken

The Amended Complaint alleges that to pressure John to sell his shares for "an unreasonably low price" of $2.5 million, offered by Daniel, at a December 20, 1991, meeting, Daniel unilaterally cut officers' salaries from $5,000 to $1,000 per week. In support of this theory, Plaintiffs plead Judge Ward's order in *Palmadessa* adjudicating Daniel in contempt for wilfully violating a

shareholders' agreement that provided for equivalence in officers' salaries.

Daniel argues that Judge Ward's order is immaterial to the issues pleaded in this case but will work a material unfairness and prejudice to Daniel. Although the material may be prejudicial, Plaintiffs argue convincingly that the pleading is necessary to support its claim that Daniel intentionally violated that order for the purpose of oppressing John and then continued a contempt proceeding to oppress him further. The allegation will not be stricken.

### B. The Allegations Concerning the Settlement Negotiations Will Be Stricken

Daniel seeks to strike the Amended Complaint's references to the parties' early settlement efforts in one of the prior state court dissolution actions, contending that the settlement was not concluded because "Daniel would not negotiate in good faith concerning the details of the transaction, but wanted to pay John less than what Daniel had agreed to pay him."

Evidence of settlement negotiations is generally not admissible. *American Ins. Co. v. North American Co. for Property & Casualty, Inc.*, 697 F.2d 79, 82 (2d Cir. 1982); *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 827–28 (2d Cir.1992); *Alpex Computer Corp. v. Nintendo Co., Ltd.*, 770 F.Supp. 161 (S.D.N.Y.1991); *Olin Corp. v. Insurance Co. of North Am.*, 603 F.Supp. 445 (S.D.N.Y. 1985), *reargued* 607 F.Supp. 1377 (S.D.N.Y. 1985); *Fed.R.Evid.* 408. The fact that Daniel "wanted to pay John less" for the latter's stock is not an exception that warrants departure from exclusionary rules. The allegation will be stricken.

### C. The Allegations Concerning the Indictment Will Not Be Stricken

The Amended Complaint refers to the indictment, subsequently dismissed, of Red Ball and Daniel for alleged dumping at the Farm. Although "motions to strike, while not favored, may be granted where the allegations challenged have no real bearing on the subject matter or are likely to preju-

dice the movant." *See F.R.A. S. p. A. v. Surg–O–Flex,* 415 F.Supp. 421, 427 (S.D.N.Y. 1976), the inclusion of the indictment is necessary to demonstrate that Daniel had a motive to personally agree to enter into an administrative consent order to clean up the Secluded Acres dumping and then to skirt that obligation to Red Ball in violation of his fiduciary duty. The allegation will not be stricken.

### D. The Allegations Concerning the Attorney Communications Will Not Be Stricken

 The Amended Complaint refers, in support of Plaintiffs' racketeering and fraud claims, to letters written by Gutman during the litigation of and efforts to settle John's dissolution actions. Although "legitimate acts of attorneys on behalf of clients cannot form the basis of a R.I.C.O. claim," *Morin v. Trupin,* 711 F.Supp. 97, 105 (S.D.N.Y.1989) (Sweet, J.), the inclusion of the allegation is necessary to Plaintiffs' efforts to demonstrate that Daniel attempted to legitimize his actions by having an attorney write letters on his behalf, and it is unlikely to be prejudicial. The allegation will not be stricken.

### IV. No Claims Will Be Severed

#### A. The Secluded Acres Claim Will Not Be Severed

 The Amended Complaint includes allegations relating to the indictment of Red Ball and Daniel for dumping at Secluded Acres debris "some of which may originally have come from Red Ball," his having "fraudulently caused Red Ball to enter into an administrative consent decree," and his having improperly applied Red Ball funds to the remediation costs.

On April 10, 1995, Secluded Acres Farm, Inc. and its owner, Thomas DiOnisio, instituted an action in the Superior Court of New Jersey against Red Ball and Daniel alleging that "[f]or two weeks in February 1988, [Daniel] had trucks from Red Ball deliver materials to the property." Civil Complaint, *DiOnisio v. Palmadessa,* Docket No. L–3083–85 (Super.Ct.N.J., Law Div.).

Daniel argues that the Secluded Acres allegations should be severed from this case pursuant to Rule 42(b), Fed.R.Civ.P. He asserts that trial of the issue will involve extensive technical evidence and testimony that will distract the jury from Plaintiffs' core allegations. Daniel intends to argue at trial that DiOnisio fully participated in the dumping on his property, that the material in place at Secluded Acres does not violate New Jersey environmental regulations and protocols, that it need not be removed, but may safely be remediated in place, and that, therefore, Secluded Acres and its owner have not been damaged or devalued. Cross claims will be interposed among Red Ball and Daniel, he argues, and third-party claims will bring in John and the DEP.

Daniel asserts that this Court lacks jurisdiction over the DEP, DiOnisio, and Secluded Acres Farm, Inc. He notes further that the New Jersey Action may bring all necessary parties together and result in a single judgment which will (unless that action is settled) adjudicate all claims. In contrast, he asserts, continuing the Secluded Acres action in this case will distract the jury from Plaintiffs' core contentions, needlessly prolong and complicate the trial, threaten a judgment inconsistent with the judgment in the New Jersey Action, and severely prejudice Daniel through implications of recrimination.

Nonetheless, this Court has ample discretion over severance. Here, the New Jersey Action is in its infancy and this action approaches the eve of trial. Severing the actions will only further delay the resolution of this dispute, which is sufficiently complicated that the inclusion of the issues raised by Daniel will not significantly add to the complexity of the trial.

The motion to sever will be denied.

#### B. The Claims Against Recycling Will Not Be Severed

 Arguing that Recycling is an indispensable party, Daniel seeks to sever the claims and allegations related to Recycling, or, in the alternative, to dismiss the claims against Fortune and Supreme.

Plaintiffs contend that Daniel fraudulently embezzled Red Ball's property right to main-

tain its good will by assisting William and Donald to conduct business with Red Ball customers through Recycling and by using the identical logo that Red Ball used.

Daniel notes that Red Ball is maintaining a second action in this court, *Red Ball Interior Demolition Co. v. Red Ball Recycling,* 94 Civ. 5256 (RWS), upon allegations identical to those in the Amended Complaint with regard to Supreme and Fortune and is relying on payments by Structure Tone, a Red Ball customer, to support its claim of trademark confusion. He notes that if successful in obtaining a judgment in the instant action, Red Ball will assert that judgment as collateral estoppel in the matter involving Recycling.

Recycling, however, is not an indispensable party. Complete relief can be awarded without the involvement of Recycling. Given the pendency of that action and the stage of this trial, this Court will exercise its discretion not to sever, nor will the claims against Supreme and Fortune be dismissed.

### V. *The Motion for Summary Judgment Dismissing the Claims Arising from the Alleged Diversion of Money to the Horse Farm Before June 6, 1988, Will Be Granted*

■ The claims arising from acts of diversion to the Horse Farm before June 6, 1988, are time-barred. The Amended Complaint alleges that between 1985 and 1987, Daniel increased the value of the Horse Farm. A six-year limitations period applies to Plaintiffs' claims related to the diversion of assets to the Horse Farm. N.Y.C.P.L.R. § 213(7) (McKinney 1990).

■ Plaintiffs note that under Rule 15(c), Fed.R.Civ.P., "an amendment of a pleading relates back to the date of the original pleading." They argue that the original pleading for the purposes of this Rule is not the Initial Complaint filed on June 6, 1994, in this action, but the amended answer and counterclaim dated April 19, 1990, in the *Palmadessa v. Palmadessa* action before Judge Ward. This is not, however, the same action as *Palmadessa v. Palmadessa;* indeed, Judge Ward deemed it not to be related.

■ Plaintiffs argue further that Daniel fraudulently concealed the fact that he had diverted Red Ball's labor and equipment to the Horse Farm in his affidavit dated February 27, 1989, and that the truth of this matter did not emerge until the July 2, 1992, trial in the contempt proceeding before Judge Ward. Yet, as noted above in the context of the fraud claims, John has testified that he did not, at that time, trust Daniel, and Daniel will not, therefore, be estopped from asserting the statute of limitations.

The claims arising from acts of diversion of funds from Red Ball to the Horse Farm prior to June 6, 1988, will be dismissed.

### VI. *The Motion for Summary Judgment Dismissing the Claims Arising from the Alleged Diversion of Money to Sunset Will Be Denied*

■ Daniel suggests that this same logic applies to the diversion of funds to Sunset, since John learned of Sunset's existence more than six years ago. However, the fact that John learned of the existence of Sunset does not indicate that he was on notice that resources were being diverted to Sunset, as alleged in the Amended Complaint.

■ Daniel suggests further that no issue of material fact exists as to the diversion of funds to Sunset. A reasonable finder of fact, however, could find that money was diverted to Sunset, given that Sunset may have been utilizing free rent from Red Ball and employing its trucks without payment.

### VII. *The Motion to Dismiss the Eighth Claim Will Be Denied*

Daniel seeks to dismiss Plaintiffs' Eighth Claim for recovery of unpaid loans. He argues that absent an agreement among shareholders, a closely-held corporation is not entitled to recover interest upon officers' loan accounts. As in his last motion seeking to dismiss this claim, *see Red Ball I,* 874 F.Supp. at 591, the existence of a factual dispute is highlighted by Daniel's argument, and the Claim will not be dismissed.

## VIII. *The Other Motions for Summary Judgment Will Be Denied*

The Amended Complaint alleges that Daniel dissipated $2.5 million in company funds after 1990 to weaken Red Ball's financial condition and to force John to sell his shares at an unreasonably low price by intentionally refusing to negotiate reduced rent for the transfer station lease and overpaying workers and undercharging customers.

Daniel seeks summary judgment on these claims, noting that John was an officer of United City and Red Ball during the years before 1993, that he spent time at the company offices overseeing his investment, that he had complete access to the companies' books, and that he commissioned audits.

Daniel notes further that, regarding the transfer stations lease, John was President of United City, the lessee on one of those leases, that he was represented by the law firm of Shea & Gould, that he had reviewed all of the lease terms, and that he had accompanied Daniel to a meeting with the landlord's attorney, Mr. Bernstein.

██ Daniel seeks to parse Plaintiffs' claims too finely. Even if it is the case that certain elements of the remaining claims must be dismissed, Daniel has failed sufficiently to demonstrate the impact on the specific claims in the Amended Complaint. Summary judgment cannot be granted on those claims, given that these claims are made up of multiple allegations not addressed in this motion for summary judgment.

Daniel further seeks summary judgment because Plaintiffs have not adequately complied with discovery demands. The motion is denied.

## IX. *Disqualification*

### A. *Horowitz Will Be Disqualified*

██ The three prongs of the successive representation test are all met by Horowitz's representation of Red Ball in the New Jersey Action, and Horowitz will, therefore, be disqualified from representing any of the Defendants in this action.

Red Ball is a former client of Horowitz. Horowitz, by admission of all of the parties, represented Red Ball in the Criminal Action. *State of New Jersey v. Daniel J. Palmadessa and Red Ball Demolition Corp.*, N.J.Super.Ct., Law Div., Criminal, Indictment No. SGJ214–88–8. Daniel argues, however, that John, not Red Ball, is the real party in interest in this case, and that the first prong is thus not met. He points to language in the original Complaint referring to this action as a "dispute between two brothers" and to alleged remarks by Dunnegan to Horowitz that John's goal in this litigation is "to wipe [Daniel] out financially," which he construes as an admission that Red Ball itself has no goal in this case, but is simply a passive, nominal, technical party. Yet although this Court has no difficulty believing that this litigation is animated by the petty squabbles of two brothers, Red Ball is without question a party in interest in this action, given that it asserts each claim in the Amended Complaint, except Claims Two and Six.

The second prong of the successive representation test is met by the fact that there is a substantial relationship between the issues in the New Jersey criminal action and this one. The Second Circuit has honed the "substantial relationship" test in practical application to granting disqualification only upon a showing that the relationship between issues in the prior and present cases is "patently clear". *Government of India v. Cook Indus., Inc.*, 569 F.2d 737, 739–40 (2d Cir.1978). "Put more specifically, disqualification has been granted or approved recently only when the issues involved have been 'identical' or 'essentially the same.'" *Id.* at 740. Although the questions of law and fact were somewhat different in the Criminal Action and this case, both involve the facts and circumstances related to the Secluded Acres Dumping and the responsibility for the future clean-up costs. As a result, the witnesses, testimony, and other evidence germane to one action are likely to be similar to the other. Thus, although the issues may not be identical, they are certainly essentially the same.

The third element of this test is demonstrated by the fact that Horowitz "had access

to relevant privileged information," *Government of India v. Cook Indus., Inc.*, 569 F.2d 737, 740 (2d Cir.1978), as a result of his work on the criminal action related to the Secluded Acres incident. Given the attorney-client relationship between Red Ball and Horowitz described above, it is impossible to conclude that Mr. Horowitz lacked access to confidential information. *See id.; United States Football League*, 605 F.Supp. at 1461 (when the moving party is a former client of the challenged attorney and the latter representation is substantially related to the prior representation, there is a presumption that the former client imparted confidential information).

Daniel asserts that Horowitz never received any privileged or confidential information from Red Ball about the facts of the criminal case. Since Horowitz did not intend to litigate the criminal case on the merits, Daniel asserts, Horowitz had no need for privileged or confidential information about the facts of the criminal case. Horowitz does not deny, however, that he had at least some access to privileged information.

 Daniel argues that Red Ball waived its objection to Horowitz's representation of Daniel. Dunnegan has known and has been repeatedly advised since November 11, 1994, Daniel asserts, that Horowitz was representing Daniel in various fora with regard to issues related to the Secluded Acres matter, and neither Dunnegan nor his clients objected to that representation. Although some courts have held that "[w]here there is inordinate and inadequately explained delay, a finding of a waiver or implied consent may be appropriate," *British Airways v. Port Auth.*, 862 F.Supp. 889, 901 (E.D.N.Y.1994) (*citing Lewis v. Unigard Mut. Ins. Co.*, 83 A.D.2d 919, 442 N.Y.S.2d 522, 523 (1st Dep't 1981)), the delay here is neither inordinate nor inadequately explained. Daniel notes that Dunnegan did not object to Horowitz's representation of Red Ball at a January 5, 1995 meeting between Dunnegan and Horowitz. Dunnegan notes, however, that on December 7, 1994, Horowitz had written to Red Ball, offering his services to Red Ball with respect to the Secluded Acres issue, and represented to Dunnegan that:

I am willing to help Red Ball on this current issue, but I do not intend to get involved in the middle, financially, conflict-wise or otherwise, of the squabble between the brothers Palmadessa.

Dunnegan apparently relied on this letter. After that meeting and one subsequent telephone conversation, which Dunnegan alleges to have been non-substantive, Horowitz was not seen again by Dunnegan, although eight days of party deposition were taken. Dunnegan next encountered Horowitz at a conference before this Court on May 17, 1995. The next day, Dunnegan sent Horowitz a facsimile transmission, asserting that Horowitz had a conflict of interest and requesting that Horowitz withdraw.

In sum, even taking Daniel's contentions that Horowitz gained no knowledge during his past representation of Red Ball as true, the fact that Horowitz had at least some access to such facts and witnesses presents enough of an appearance of a conflict of interest to meet the successive representation test and to warrant disqualification.

 It is emphasized in disqualifying Horowitz from representing Defendants that no facts have been found and no conclusions have been reached that should be read to cast aspersions on Horowitz's abilities or ethics as an attorney and officer of this Court.

## B. *Dunnegan Will Not Be Disqualified*

Federal courts have an independent interest in insuring that trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them. The question of disqualification of counsel therefore implicates ... the interest of the courts in preserving the integrity of the process and government's interest in insuring a just verdict and a fair trial.

*Wheat v. United States*, 486 U.S. 153, 160, 108 S.Ct. 1692, 1698, 100 L.Ed.2d 140 (1988). A trial judge has the inherent authority to regulate lawyers' professional conduct. *See Ceramco, Inc. v. Lee Pharmaceuticals*, 510 F.2d 268, 270–71 (2d Cir.1975). However, on the facts presented, and given the conflicting declarations of the parties involved, it cannot

be definitely concluded that Dunnegan's behavior warrants disqualification. The "mere appearance of impropriety without any evidence that the trial will be tainted by attorney conduct 'is too slender a reed on which to rest a disqualification order.'" *Fisons Corp v. Atochem North Am., Inc.,* 1990 WL 180551, 1990 U.S.Dist. LEXIS 15284 (S.D.N.Y.1990) (*quoting Nyquist,* 590 F.2d at 1247) *see also In re Joint Eastern & Southern Dist. Asbestos Litig.,* 133 F.R.D. 425, 429 (E. & S.D.N.Y.1990) (Weinstein, J.). Although Dunnegan's actions may subject him to future disciplinary action by the bar of this Court and of other bars of which he is a member, his actions do not present a danger of an unjust verdict or unfair trial in this action, and he will not be disqualified as Plaintiffs' counsel. It is not apparent from the facts that the payment induced Oz to lie. Further, Oz's subsequent willingness to swear an affidavit for Daniel suggests that Daniel will not suffer as a result of Dunnegan's actions.

Daniel notes that Dunnegan's acts could be held to constitute criminal misconduct. First, he alleges, the payment to Oz was made in return for Oz's testimony, thus violating 18 U.S.C. § 201(d), which imposes criminal penalties for payment with the intent of influencing testimony. Second, Daniel asserts, by confirming John's statement that Oz could be hurt or killed by Daniel, Dunnegan acted in violation of 18 U.S.C. § 1512(b), which imposes criminal penalties on one who intimidates another in order to "influence, delay, or prevent the testimony of any person in an official proceeding." Third, he argues, Dunnegan conspired with John to interfere with Daniel's civil rights by obstructing justice by telling Oz that he would be hurt or killed, in violation of 42 U.S.C. § 1985(2).

Although a conviction for criminal activity may be reason for an attorney's disbarment, Dunnegan has not been convicted of these crimes, and they do not, therefore, mandate his disqualification from representing Plaintiffs in this action.

Daniel also suggests that payments to witnesses other than those permitted by law, 28 U.S.C. § 1821, are violations of federal law and the canons of ethics of the American Bar Association. It is true that the ABA Model Code provides that excessive payments should be avoided. There is, however, no corresponding disciplinary rule. On the facts presented, this Court cannot conclude that the payments made to Oz were illegal or unethical. As noted above, the party seeking to disqualify another's attorney bears the burden of establishing the need for disqualification. *Evans,* 715 F.2d at 794. As to the $3,500 payment, the Federal Rule of Civil Procedure imposes on parties or attorneys the responsibility to "avoid imposing undue burden" on a person subject to a subpoena, which may include provision for lost earnings. The time Oz was asked to commit was not fixed, and the $3,500 could conceivably be found to represent that loss. Rule 45(c), Fed.R.Civ.P. As to the $6,000 payment, Daniel has not presented sufficient evidence that the $6,000 was not within the range of reasonable compensation for the claim Oz agreed to relinquish against Red Ball.

Daniel argues further that Dunnegan has made himself a witness and should thus be disqualified from continuing as an attorney in this action. The cases cited by Daniel for the proposition that disqualification is required where an attorney is implicated in allegations against the accused all took place in a criminal context. Moreover, it is by no means clear at this point that Dunnegan is a necessary witness in this action, though he might be in a separate action related to the alleged subornation of Oz's perjury.

Dunnegan will not be disqualified at this time. Daniel's motion to compel Dunnegan to turn over all documents related to the deposition of Oz will be granted. No hearing is required at this time.

## X. *The Amended Complaint Will Not Be Dismissed*

██ Daniel argues that by corrupting and intimidating Oz, Plaintiffs and Dunnegan have irreparably damaged Daniel's ability to defend himself in this action. Oz, asserts Daniel, would have testified to the regularity of the move from Washington Street to New Jersey. In compromising Oz, he claims, Dunnegan and John compromised an impor-

tant element of Daniel's proof: the absence of evidence of wrongdoing in Red Ball's records.

Daniel makes no further relevant argument for dismissal of the amended complaint. There is no reason to believe at this point that Oz will not testify personally if asked. Otherwise, the acts alleged are insufficient to warrant dismissal of this action, and it will not be dismissed.

### XI. *The Motion to Compel Filing of a Pre–Trial Order Will Be Granted*

Daniel has requested an extension of time to file a pretrial order, asserting that Plaintiffs have yet to produce copies of essential documents. Plaintiffs state that they have produced these documents and move to compel the filing of a pretrial order. Correspondence between the attorneys in this action suggests, though not conclusively, that the documents have been produced.

The motion to compel the filing of a pretrial order will be granted.

### XII. *Sanctions Will Not Be Imposed*

Daniel moves for sanctions on Plaintiffs and Dunnegan pursuant to Rules 11(b) and (c), Fed.R.Civ.P., for repleading RICO claims in this action and repleading RICO embezzlement of pension fraud claims. Specifically with regard to the RICO pension fraud claims, argues Daniel, Dunnegan and his law firm participated fully in the termination of the Red Ball plan and in determining the extent of overfunding in the plan, and calculating the reversion amount. Persisting in the RICO claims and adding the RICO pension claim was not responsible, Daniel argues, and resulted in needless and costly motion practice.

Rule 11 sanctions will not be imposed. The parties have raised legal issues sufficient to constitute a differing interpretation of the law. *Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006 (2d Cir.1986). Resolving ambiguities in favor of the filing party, *Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir. 1986), *cert. denied*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987), the filings are not frivolous.

### *Conclusion*

Any objection urged by a party on which the Court has not commented has been considered by the Court and rejected summarily as irrelevant or meritless.

For all of the foregoing reasons:

1. Daniel's motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is denied.

2. Daniel's motion to dismiss for failure to plead fraud with sufficient particularity pursuant to Rule 9(b) is denied.

3. Daniel's motion for summary judgment pursuant to Rule 56 is granted in part and denied in part. Specifically, Daniel's motion is granted with regard to the First Claim, the RICO claim against Daniel; the Second Claim, for common law fraud against Daniel; and those elements of the other claims that pertain to the alleged diversion of funds to Daniel's Horse Farm that occurred prior to June 6, 1988. The motion is denied with regard to all other claims.

4. Daniel's motion to strike certain allegations is granted in part and denied in part. Specifically, Daniel's motion is granted with regard to the allegations concerning settlement negotiations. The motion is denied with regard to all other allegations.

5. Daniel's motion to sever or dismiss all claims and allegations pertaining to Red Ball Recycling is denied.

6. Daniel's motion to sever or dismiss all claims and allegations pertaining to Fortune and Supreme is denied.

7. Daniel's motion for Rule 11 sanctions is denied.

8. Daniel's motion to compel Plaintiffs to relinquish a copy of the transcripts and notes of any deposition given by Oz is granted.

9. Daniel's motion for a hearing to determine the facts surrounding the deposition of Oz is denied.

10. Daniel's motion to dismiss the Amended Complaint in its entirety is denied.

11. Daniel's motion to disqualify William Dunnegan is denied.

**1248**

12. Red Ball's motion to disqualify Donald Horowitz is granted.

13. Plaintiffs' motion to compel Defendants to submit a final pretrial order is granted.

It is so ordered.